LESLIE ROTH, APPELLEE, V.
GARY WIESE, APPELLANT.
716 N.W.2d 419

Filed June 16, 2006. No. S-04-1117.

David E. Copple and Michelle M. Baumert, of Copple & Rockey, P.C., for appellant.

David A. Domina and Timothy G. Himes, Sr., of Domina Law, P.C., for appellee.

HENDRY, C.J., CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

STEPHAN, J.

Leslie Roth brought this civil action against Gary Wiese, her paternal uncle, asserting several claims relating to sexual abuse allegedly committed by Wiese between 1967 and 1974. Roth sought damages for her own injuries and as the assignee of her husband's claim for loss of consortium. In Wiese's answer, he

denied the claims and asserted various affirmative defenses. Prior to and during a jury trial in the district court for Cuming County, the court dismissed all claims except for Roth's claim that Wiese had intentionally inflicted emotional distress upon her by initiating certain communications in 2002. That claim was submitted to the jury. The jury returned a verdict in favor of Roth in the amount of $150,000, and the district court entered judgment accordingly. After the district court overruled his motion for a judgment notwithstanding the verdict or, in the alternative, for a new trial, Wiese perfected this timely appeal, which we moved to our docket on our own motion pursuant to our statutory authority to regulate the caseloads of the appellate courts of this state. See Neb. Rev. Stat. § 24-1106(3) (Reissue 1995). We conclude that there was no reversible error and therefore affirm the judgment of the district court.

## I. FACTS

Roth was born in Norfolk, Nebraska, in 1963 and resided there until leaving for college in another city after her 1981 high school graduation. At the time of trial and for several years prior, Roth lived and worked in La Crosse, Wisconsin, with her husband, Steve Roth, their child, and her two children from a previous marriage. Wiese, who resides in Wisner, Nebraska, is the brother of Roth's father, who resides in Norfolk. Wiese is approximately 10 years older than Roth.

Roth testified that in 1967, when she was 4 years old, Wiese began sexually assaulting her during visits to her grandparents' home in Wisner. She testified that these attacks occurred 150 to 200 times and continued until she was 10 or 11 years old and strong enough to resist. Wiese was approximately 14 years old when the assaults began. Roth testified that Wiese threatened her during the assaults, stating that if she fought, "he'd make it hurt more," and that if she reported the assaults to her grandparents, they would hate her, call her a liar, and never want to see her again. She testified that she did not tell anyone of the assaults at the time because she feared Wiese. Roth stated that during her adult life, she had only limited contact with Wiese.

In 1998, Roth told her psychotherapist Monica Lazere of the attacks. At the time, Roth was seeing Lazere for counseling related to her first marriage, which had ended in divorce. Lazere

had diagnosed Roth with dysthymia, which she described as " 'longstanding depression of less intense proportion than clinical depression, but definitely always a black cloud that is there.' " Roth testified that the "secret was eating [her] up inside," so she told Lazere about it because she wanted to "get some help." Lazere saw Roth once in December 1997 and 15 times in 1998, and the sexual abuse issue came up during the latter sessions. Lazere was prepared to change the focus of treatment to work with the issue, and they began some treatment. However, the treatment was discontinued because Roth indicated that she did not want to deal with the sexual abuse issue and " 'felt okay.' " Roth told her future husband, Steve, about the assaults in approximately February 1999.

While her father was visiting her home in Wisconsin in late 2001, Roth told him of the assaults, because she had learned in therapy that she needed to tell the people that she should have told at the time of the assaults in order to help her heal. When he returned to Nebraska, Roth's father contacted law enforcement authorities in Cuming County and reported Roth's allegations against Wiese.

On April 27, 2002, Wiese telephoned Roth at her home in Wisconsin. According to Roth, when she answered the telephone, Wiese said, " 'This is your Uncle Gary calling and I want to know what the hell you told your dad.' " Roth testified that during this conversation,

> Every threat that he ever made to me was repeated about what would happen to me if I told what he had done to me.
> He said — he told me that I'd be in trouble, that I'd be called a liar, that I would get it, that he'd make me regret it.

Roth stated that Wiese was very angry and spoke in an intimidating tone. She testified that he said, " 'I told you to keep your mouth shut. What the hell do you think you're doing? What do you open your mouth for now after all these years?' " Roth testified that Wiese also told her that he knew she had told her father because the sheriff had been investigating him for sexual assault. Roth told Wiese never to call her again.

Roth testified that she was very afraid after the telephone call and that it brought back all the threats Wiese had ever made to her, so that "now I live with the threats, and I live in fear that

he's going to get me, that no one will believe me, that I'll be the liar, that he'd hurt me." After the call, she was afraid that Wiese was going to come to her house and harm her or her children.

In approximately May 2002, Roth received a letter from Wiese. In this letter, he stated that he was "sorry for what I did to you those 30+ years ago." He also stated that he was going to be removing himself from the family, and he requested that if she had "any other demands" of him she should "inform [him] in writing." In July, Roth received another letter and a card from Wiese. Enclosed in the card was a check for $1,000. The letter requested that she accept the check "to help in your healing proccess [sic]. Hopefully some day you will be able to forgive me. Please." Roth had never received a card or a gift of money from Wiese in the past. On the advice of counsel, Roth cashed the check.

On July 22, 2002, Roth's lawyer sent a certified letter to Wiese. The letter stated that in order to avert the commencement of a lawsuit against him, Wiese was to sign an agreement waiving the statute of limitations and agree to pay Roth $125,000. On July 23, Wiese left a voice message on the Roths' answering machine. The message stated:

> Yeah, this message is for Leslie. This is her uncle Gary in Wisner. I got your letter from your lawyer today. Yeah, and I didn't know it was so easy as all it would take is $125,000 to satisfy you. Uh, why didn't you sue for about ten million cuz I'm not paying you that $125,000. Uh, go ahead and sue me and uh, here's a little story for you that our [pastor] always told us. Uh, cuz I'm sure that $125,000 ain't gonna make everything all right for ya. Ya know there was this married lady and this guy asked her if he [could] sleep with her for a million dollars and she said why of course. Then he asked her to sleep with [him] for a dollar and she said well what kind of woman do you think I am? I wouldn't sleep with you for a dollar. He said well we know what kind of woman you are. We're just trying to establish a price. So maybe ya oughta think about that, ya know, as for $125,000 everything's gonna be just fine with ya. Well I don't think so. So take me to court and sue me. I'm willing to go. Good bye.

Roth testified that she found the message shocking, hideous, degrading, insulting, and berating. Her husband, Steve, was irate, and he immediately called the number that Wiese had called from and left a message telling Wiese never to call again.

Later that day, Wiese left three additional messages on the Roths' answering machine. The first told Steve to be a "real man" and call Wiese back. The second, recorded just minutes later, stated:

> Yeah, Steve, Gary again. You are right. There is some-body sick and it's not me and she needs help bad. But at least I admit I made a mistake 35 years ago and uh, it got corrected back then. At least I'm not ruining young girls' lives today like Leslie and her dad have done to my wife's family so if you've got any complaints, I wish you'd hurry up and get this thing into court and sue me so we can drag everybody into court and get this thing settled because I would like to get on [with] my life with my wife and daughter. And if you don't want to get on with your life, that's fine with me. But at least let us get on with ours so get this thing into court, get me sued, and let's get this thing settled once and for all. Thank you much [sic] for your time.

The third message was left approximately 2 hours later:

> Yeah, Steve, ya there? Pick up. (long pause) Well since you won't pick up Steve, I guess, you can tell your wife to call her father and tell him he should be real proud of him-self for what he's done to my wife's family and their three little girls out in Wisconsin. You think you've got explain-ing to do, I figured you'd already talked to them about what an asshole I was. So they got three little girls out there that uh, they gotta explain to for something that they shouldn't have to be explaining to because I got a . . . cuz Leslie's got a dad that ruined their three lives so I . . . tell Leslie to call him and tell him to be real proud of himself. Thank you very much. (long pause) Oh yeah Steve, by the way, I was a juvenile when this happened. I got a half an excuse. I don't know what your wife and her father's excuse is.

Roth testified that these contacts from Wiese brought memo-ries of everything he had done to her since she was 4 years old "flooding back." Because of her fears, Roth installed a caller

identification device on all of the telephones in her home and instructed her children not to answer unless they recognized the number calling. She changed the locks on her doors and began dead-bolting the doors every night. She became very guarded about the children going anywhere alone and also purchased a handgun and learned how to use it. In addition, she and Steve relocated to a new home and obtained an unlisted telephone number, all so that Wiese could not find her.

Roth testified that after the contacts from Wiese, she had difficulty falling asleep and staying asleep. She would have nightmares about Wiese assaulting her or her daughters. She acknowledged on cross-examination that she had experienced some difficulty sleeping prior to the April 2002 telephone call and that her nightmares prior to that date involved the same subject matter as the nightmares she had experienced after the call. She stated, however, that the nightmares had become more frequent.

Roth testified that she sold advertising on commission, and there was evidence that her income decreased after the contacts by Wiese. In addition, Steve testified that prior to the contacts from Wiese, Roth had a positive, friendly personality, but afterward, she was depressed and negative. Following the contacts, Roth began using alcohol on a daily basis and would come home from work and go to sleep. Roth did not interact with her children as she had previously and became short-tempered. Steve also testified that their marital relations had decreased in frequency after the contacts.

After the contacts by Wiese, Roth initially attempted to cope on her own with "all the memories that came flooding back," but eventually resumed counseling with Lazere in March 2003 and informed her of the 2002 contacts by Wiese. Roth described the telephone calls and letters she received from Wiese as " 'bizarre' " and told Lazere that she was very fearful for her children. Roth told Lazere how Wiese had terrified her as a little girl by saying she would lose her grandmother and how she felt that way again, " 'as if he was right in her living room having all this power over her.' " According to Lazere, Roth's reactions were not atypical of a sexual abuse victim who had been untreated. In fact, Lazere opined that the contacts by Wiese were " 'bringing all of these issues right to the surface again . . . as if she were in danger right

now.'" Lazere testified that untreated victims of sexual abuse can "'jump right back into the memories of what they felt like at that time and feel very vulnerable and very frightened.'" Roth reported to Lazere that she had stomach aches, that she felt nauseous, that she was losing weight, that she was nervous, and that she could not sleep. Lazere referred Roth to a psychiatrist for anxiety medication and then helped Roth deal with her anxiety.

Lazere diagnosed Roth with posttraumatic stress disorder, which she described as

> "a reaction to an event that is so out of the ordinary that the body doesn't know how to cope with it. And if she has not developed coping skills with it, then — then she would not have the control to keep it in a time frame that — it also keeps you in a time warp of the time when it occurred and — and it's most easily explained when you look at war veterans, when they just even smell something that smelled like it was in part of their — their war experience, where they had a horrible experience, if they just smell that, it's as if they're back there, and there's nothing — everything in between gets moved away because it's almost — because it almost becomes a part of their — of their — it's just a deep part of the person."

Lazere stated that she was treating Roth by helping her to put things into a current timeframe and that she hoped Roth would continue to improve in her healing in the future. Lazere testified that Roth was in the second of three stages experienced by a sexual abuse victim and was beginning to share her abuse with others and develop a support system but had not reached the stage of full healing and had not ended treatment. On cross-examination, Lazere acknowledged that she was aware of litigation between Roth and Wiese and stated that from March to November 2003, much of the anxiety experienced by Roth was related to events with respect to the litigation. Lazere noted, however, that all of Roth's worries were ultimately related to the sexual abuse. She clarified on redirect that her treatment of Roth during 2003 was not limited to the effects of litigation.

David A. Van Dyke, a psychiatrist associated with Lazere's practice, also testified by deposition regarding his treatment of Roth. Van Dyke interviewed Roth on several occasions, beginning

in March 1998. At that time, he diagnosed her with an adjustment disorder relating to her failed first marriage. He suggested medication to address her difficulty sleeping, and shortly thereafter, he prescribed an antidepressant. Van Dyke had no professional contact with Roth from June 1998 to March 2003.

In 2003, Roth reported to Van Dyke that she was experiencing anxiety to the extent that she felt disassociated. She told him that Wiese had filed suit against her for slander. She also reported that she had filed suit against Wiese. Van Dyke diagnosed Roth at that time with adjustment disorder with severe anxiety and depression. He opined that Roth's disorder was caused by the suit filed against her and the fact that her grandmother was turning against her. Van Dyke's last meeting with Roth was in August 2003.

Rosanna Jones-Thurman, a clinical psychologist licensed in Nebraska and Iowa, testified on behalf of Wiese. Thurman performed a "Detailed Assessment of Post-Traumatic Stress" (DAPS) test and a "Minnesota Multiphasic Personality Inventory" (MMPI) test on Roth. The tests were conducted after a 1-hour clinical interview on December 5, 2003. During the interview, Roth reported that Wiese had been harassing her and leaving messages, but did not give specific dates. Roth reported that she felt she was reliving some things and that she had some specific memories of things that had happened or things Wiese had said to her.

Thurman explained that the MMPI is a personality test that also tells whether an individual is significantly depressed or anxious. DAPS is a test that assesses whether a person has a post-traumatic stress disorder or an acute stress disorder. Thurman explained that Roth's MMPI revealed elevations of depression, paranoia, psychothemia, schizophrenia, and social introversion. Based on these findings, Roth would be tense and irritable, depressed, introverted, and have trouble trusting others. Thurman explained that psychothemia is a condition of physical symptoms caused by anxiety, such as headaches and stomach aches.

With respect to the DAPS test, Roth met the criteria for post-traumatic stress disorder. Although Thurman conceded the validity of the test results, she noted that the DAPS test is very transparent and that Roth's results seemed slightly overexaggerated. Based on this testing, Thurman diagnosed Roth with generalized

anxiety disorder and dysthymic disorder, a chronic, irritable depression.

Terry Davis, a psychiatrist and lawyer practicing forensic psychiatry, also testified on behalf of Wiese. Davis reviewed Lazere's records, Van Dyke's records, and some of Roth's other medical records. He also reviewed the pleadings and court filings, the depositions of Roth and Steve, and Thurman's report. Davis interviewed Roth for 1½ hours on December 5, 2003. Roth reported to him that she was involved in a lawsuit against Wiese as a result of sexual abuse she suffered as a child. She told him that she had had ongoing problems over a 30-year period as a result of the abuse. She also stated that whenever she received correspondence related to the lawsuit, she would get panic attacks. Roth did not tell Davis about the April 2002 telephone call or the subsequent messages left by Wiese. Roth described her childhood to Davis as "typical," although she had previously indicated in therapy that her childhood was very difficult.

During the interview with Davis, Roth was "guarded." When she discussed the sexual abuse, she was "flat and blank." However, when she discussed the stress of the lawsuit, she became very emotional and started crying. Davis also reported that Roth appeared "honestly quite paranoid" that Wiese would somehow "track her down." Based on all the information available to him, Davis diagnosed Roth with an adjustment disorder with mixed anxiety and depressed mood. He explained that this was a temporary reaction to situational stressors. He also diagnosed Roth with a personality disorder based on "traits of paranoid, borderline, and obsessive/compulsive personalities." He opined that her adjustment disorder was caused by the stress of the lawsuit against Wiese and that the personality disorder had its roots "in childhood." He opined that the adjustment disorder would resolve upon completion of the lawsuit and that the personality disorder would decrease in terms of severity as she reached middle age.

On cross-examination, Davis admitted that victims of early childhood sexual abuse can be more susceptible to emotional pain and emotional injury than someone who was not sexually abused as a child. He also acknowledged that he knew at the time he interviewed Roth that Wiese had filed a separate lawsuit against her, and he subsequently learned that Wiese had filed a

suit against Roth's father. Davis emphasized, however, that the stress experienced by Roth was not related to those other lawsuits.

Wiese testified in his own behalf. He stated that he had telephoned Roth's home in Wisconsin on April 27, 2002, in an effort to contact Roth's father, who he believed was visiting Roth at the time. He denied making the statements and threats attributed to him by Roth in this conversation. He admitted, however, that he had sexually assaulted Roth one time during their childhood, when he was 14 years old. He stated that he made the July 23 telephone call after receiving the demand letter from Roth's lawyer because he was "shocked and dismayed" that a family member would try to "blackmail" him. He then returned Steve's call later that day because he was "frustrated that nobody would communicate with me."

Wiese testified that during Roth's adult life, their families exchanged Christmas cards, and that she sent photographs of her family. His wife corroborated his version of the April 27, 2002, telephone call and testified that they had received cards and photographs over the years from Roth. She admitted, however, that they had received no correspondence from Roth after she married Steve.

## II. ASSIGNMENTS OF ERROR

Wiese assigns, restated, that (1) there was insufficient evidence to sustain the verdict, (2) the damages were excessive, (3) the district court erred in overruling his objections to jury instruction No. 9 and in refusing to give requested instructions regarding mitigation of damages and the definition of extreme and outrageous conduct, (4) the district court erred in admitting evidence regarding prior sexual contact and other pending litigation between the parties, and (5) the district court erred in overruling his motion for directed verdict, motion for judgment notwithstanding the verdict, and motion for new trial.

## III. ANALYSIS

### 1. SUFFICIENCY OF EVIDENCE

#### (a) Standard of Review

In determining the sufficiency of the evidence to sustain a verdict in a civil case, an appellate court considers the evidence

most favorably to the successful party and resolves evidential conflicts in favor of such party, who is entitled to every reasonable inference deducible from the evidence. *Genthon v. Kratville*, 270 Neb. 74, 701 N.W.2d 334 (2005); *Smith v. Colorado Organ Recovery Sys.*, 269 Neb. 578, 694 N.W.2d 610 (2005).

### (b) Analysis

■ To recover for intentional infliction of emotional distress, a plaintiff must prove (1) intentional or reckless conduct (2) that was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and is to be regarded as atrocious and utterly intolerable in a civilized community and (3) that the conduct caused emotional distress so severe that no reasonable person should be expected to endure it. See *Brandon v. County of Richardson*, 261 Neb. 636, 624 N.W.2d 604 (2001). Wiese contends that the record supports neither a finding that his conduct was outrageous nor a finding that Roth suffered severe emotional distress.

### (i) Relevant Conduct

Before addressing the question of whether Wiese's conduct was so outrageous in character and extreme in degree as to be actionable, we must identify the specific conduct in question. The jury was instructed that Roth had the burden of proving that Wiese contacted her by telephone and mail in April 2002 and thereafter and that this conduct was intentional or reckless. This conduct includes the initial telephone call which Wiese made to Roth on or about April 27, as to which there is sharply conflicting testimony. It also includes the letter sent by Wiese to Roth in May; the card, note, and check sent in July; and the recorded telephone message which Wiese left for Roth on July 23.

Wiese argues on appeal that the conduct at issue does not include the recorded telephone messages Wiese left for Steve on July 23, 2002, or a letter and recorded telephone messages which Wiese directed to Roth's father, because these communications were not made directly by Wiese to Roth. Wiese has not assigned error with respect to the admission of the evidence relating to these communications. We conclude that the letter to Roth's father and all recorded telephone messages are properly considered as a part of the conduct in question. The relevant inquiry is

not the identity of the person to whom the conduct was directed, but whether harm to the plaintiff as a result of the conduct was foreseeable. See *Nichols v. Busse*, 243 Neb. 811, 503 N.W.2d 173 (1993). Each communication at issue here relates to the subject matter of the initial telephone conversation between Wiese and Roth. The telephone messages were left for Steve on the family's home voice mail system, where it was likely that Roth would hear them or otherwise become aware of their content. It was similarly foreseeable that Roth would learn of Wiese's communications to her father. We conclude that the jury was entitled to consider all of the aforementioned conduct with respect to Roth's claim against Wiese.

### *(ii) Nature of Conduct*

Whether conduct is extreme and outrageous is judged on an objective standard based on all the facts and circumstances of the particular case. *Heitzman v. Thompson*, 270 Neb. 600, 705 N.W.2d 426 (2005); *Brandon, supra*. The facts must be such that when heard, an average member of the community would resent the actor and exclaim " 'Outrageous!' " *Heitzman*, 270 Neb. at 605, 705 N.W.2d at 431. Accord Restatement (Second) of Torts § 46, comment *d*. (1965). Mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities that result from living in society do not rise to the level of extreme and outrageous conduct. *Heitzman, supra*; *Brandon, supra*. In determining whether certain conduct is extreme and outrageous, the relationship between the parties and the susceptibility of the plaintiff to emotional distress are important factors to consider. *Brandon, supra*. Conduct which might otherwise be considered merely rude or abusive may be deemed outrageous when the defendant knows that the plaintiff is particularly susceptible to emotional distress. *Id.*

In *Brandon v. County of Richardson*, 261 Neb. 636, 624 N.W.2d 604 (2001), we determined as a matter of law that a sheriff's use of crude and dehumanizing language when interviewing the victim of a sexual assault constituted actionable extreme and outrageous conduct. Another example of conduct held to be actionable was the refusal of a funeral home to release a body until the widow paid a $490 embalming fee. *Dale v. Thomas Funeral Home*, 237 Neb. 528, 466 N.W.2d 805 (1991).

In *Nichols, supra,* we also found actionable conduct when a person who had left a seriously injured passenger to die after a motor vehicle accident called the mother of the passenger and reported that her daughter had stolen the vehicle. In *Foreman v. AS Mid-America,* 255 Neb. 323, 586 N.W.2d 290 (1998), we held that name-calling and other harassment of nonunion replacement workers did not constitute actionable extreme and outrageous conduct. In *Hassing v. Wortman,* 214 Neb. 154, 157, 333 N.W.2d 765, 767 (1983), we stated that it was "doubtful" that the defendant's harassment of his former spouse concerning her current spouse amounted to extreme and outrageous conduct, noting that he did not threaten her safety; however, the case was decided on other grounds.

Considered in the light most favorable to Roth, as our standard of review requires, the evidence demonstrates that prior to the conduct in question, Wiese had sexually abused Roth on numerous occasions when she was a child and threatened her in order to secure her silence concerning the abuse. Then, 30 years later, he contacted her by telephone at her home and angrily berated her for reporting the abuse, repeating the same threats he had made previously. Subsequently, he sent her letters begging for forgiveness and then left a message on her answering machine essentially comparing her to a prostitute. In light of the evidence that Roth was the victim of past sexual abuse perpetrated by Wiese and thus particularly susceptible to emotional distress, we conclude that the evidence was sufficient to support a finding that Wiese's conduct in 2002 was "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and is to be regarded as atrocious and utterly intolerable in a civilized community." See *Brandon,* 261 Neb. at 656, 624 N.W.2d at 620-21.

### *(iii) Severity of Emotional Distress*

Roth had the burden to prove that Wiese's conduct subjected her to mental distress " 'so severe that no reasonable person should be expected to endure it.' " See *Nichols v. Busse,* 243 Neb. 811, 817-18, 503 N.W.2d 173, 179 (1993). The endurability of the distress is a factual question for the jury; absent a complete lack of evidence on the issue we will not disturb the jury's finding. *Id.* Although outrageous conduct and severe emotional distress are separate elements of the tort of intentional infliction

of emotional distress, the two are related in that the extreme and outrageous character of the conduct is itself important evidence that severe emotional distress existed on account of the conduct. See *Brandon, supra.*

In other factual circumstances, we have held that embarrassment, humiliation, anger, and nervousness did not amount to severe emotional distress caused by outrageous conduct. See, *Dale v. Thomas Funeral Home,* 237 Neb. 528, 466 N.W.2d 805 (1991); *Hassing v. Wortman,* 214 Neb. 154, 333 N.W.2d 765 (1983). However, in *Nichols,* we held that the plaintiff's adjustment disorder/stress syndrome which resulted in hypersomnia, insomnia, recurring nightmares, anxiety attacks, depression, and headaches requiring prescription medication and counseling was sufficient to support a finding of severe emotional distress.

Here, the record discloses that after receiving the initial telephone call from Wiese, Roth had trouble sleeping, had nightmares, became fearful of her children going out, bought a gun, and relocated to a new home. There was evidence that she began using alcohol on a daily basis, that she began sleeping after work and failing to interact with her family, and that her income suffered due to an inability to concentrate. Expert testimony established that she suffered from posttraumatic stress disorder and chronic depression.

Some evidence in the record attributes Roth's emotional problems to the actual sexual abuse and/or to stress experienced by Roth as a result of the lawsuit against Wiese, rather than to Wiese's 2002 contacts. Lazere testified that Roth's symptoms were caused at least in part by the original sexual abuse and her failure to get treatment for that abuse. Lazere also testified, however, that Roth's symptoms were a result of Wiese's harassment in 2002 and that her emotional response to Wiese's renewed contacts was not atypical of a sexual abuse victim, because the contacts essentially caused her to go back in time and relive the assaults. Although Roth had some trouble sleeping and some depression before Wiese contacted her in 2002, the record reflects that these symptoms intensified after those contacts. It further reflects that her fear for the safety of her children, her inability to concentrate at work, her desire to own a handgun, and her decision to relocate to a new home all developed after the contacts. We conclude that

the evidence is sufficient to support a finding that Roth sustained severe emotional distress primarily caused by Wiese's extreme and outrageous conduct as discussed above. See *Nichols, supra* (upholding jury verdict for plaintiff where evidence established severe emotional distress was primarily caused by extreme and outrageous intentional or reckless conduct of defendant).

## 2. EVIDENTIARY RULINGS

### (a) Standard of Review

■ In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by such rules; judicial discretion is involved only when the rules make such discretion a factor in determining admissibility. *Gerhold Concrete Co. v. St. Paul Fire & Marine Ins.*, 269 Neb. 692, 695 N.W.2d 665 (2005); *Kvamme v. State Farm Mut. Auto. Ins. Co.*, 267 Neb. 703, 677 N.W.2d 122 (2004).

### (b) Analysis

■ Wiese argues that the district court erred in overruling his relevance objections and permitting Roth to testify concerning the nature and frequency of the sexual abuse. Relevant evidence, as defined by Neb. Rev. Stat. § 27-401 (Reissue 1995), is that which tends to make the existence of any fact of consequence more or less probable than it would be without the evidence. *Borley Storage & Transfer Co. v. Whitted, ante* p. 84, 710 N.W.2d 71 (2006); *Blue Valley Co-op v. National Farmers Org.*, 257 Neb. 751, 600 N.W.2d 786 (1999). The 2002 communications which form the basis of Roth's claim against Wiese refer specifically to the prior sexual abuse. The nature and frequency of that abuse is relevant to the issue of whether the communications constituted outrageous conduct and resulted in severe emotional distress. This is particularly so in light of Lazere's testimony that the 2002 communications caused Roth to relive the memories of the previous trauma and feel " 'extremely vulnerable [and] extremely frightened.' " The district court did not abuse its discretion in permitting Roth to testify regarding her specific recollection of the abuse.

Wiese also contends that the district court erred by permitting Roth's counsel on cross-examination of Davis to elicit his awareness of lawsuits brought by Wiese against Roth and her father,

over Wiese's relevance objection. This line of cross-examination was prompted by Davis' testimony on direct examination that Roth's adjustment disorder was caused "by the fact that she is involved in a lawsuit against her uncle." Previously, Van Dyke had testified without objection that Roth told him that Wiese " 'had filed suit against her for slander.' " Also, Lazere testified on cross-examination that she was aware of " 'more than one lawsuit.' " We conclude that the district court did not err in permitting brief cross-examination of Davis on this point.

### 3. Jury Instructions

#### (a) Standard of Review

Whether a jury instruction given by a trial court is correct is a question of law. When reviewing questions of law, an appellate court has an obligation to resolve the questions independently of the conclusion reached by the trial court. *Washington v. Qwest Communications Corp.*, 270 Neb. 520, 704 N.W.2d 542 (2005). To establish reversible error from a court's failure to give a requested jury instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction was warranted by the evidence, and (3) the appellant was prejudiced by the court's failure to give the requested instruction. *Smith v. Colorado Organ Recovery Sys.*, 269 Neb. 578, 694 N.W.2d 610 (2005).

#### (b) Analysis

##### *(i) Refusal to Give Requested Instructions*

Wiese argues that the trial court erred in refusing to give his requested instructions regarding mitigation of damages and the definition of extreme and outrageous conduct. Although the record of the instruction conference reflects that copies of the requested instructions were tendered to the court and opposing counsel, the record does not include the requested instructions.

Wiese argues that the district court should have given an instruction based on NJI2d Civ. 4.70 with respect to mitigation of damages. Mitigation of damages is an affirmative defense, as to which Wiese had the burden of proof. See, *O'Connor v. Kaufman*, 260 Neb. 219, 616 N.W.2d 301 (2000); *Maricle v. Spiegel*, 213 Neb. 223, 329 N.W.2d 80 (1983). Wiese alleged this

defense in an amended answer. The trial judge concluded that the tendered mitigation of damages instruction was an accurate statement of the law but was not warranted by the evidence. We agree. Based upon testimony of Lazere that Roth's " 'reactions are not atypical of a sexual abuse victim who's untreated,' " Wiese argues that the jury should have been instructed to consider the effect of Roth's "failure to obtain counseling or resolve her issues earlier in life" on the amount of her damages. Brief for appellant at 40. The doctrine of mitigation of damages applies only to post-event occurrences. *Welsh v. Anderson*, 228 Neb. 79, 421 N.W.2d 426 (1988). Roth's claim is based upon tortious conduct occurring in 2002. Wiese did not present any evidence that Roth failed to take reasonable steps to minimize her damages after the conduct in question.

 From the colloquy during the instruction conference, it appears that Wiese's other tendered instruction included a "definition of extreme and outrageous conduct citing the Restatement of Torts (Second), Section 46." The trial judge refused to give the tendered instruction, noting that while it was an accurate statement of the law, it was subsumed in another instruction setting forth the elements of the tort as defined in our case law. It is not error for a trial court to refuse to give a requested instruction if the substance of the proposed instruction is contained in those instructions actually given. *Farmers Mut. Ins. Co. v. Kment*, 265 Neb. 655, 658 N.W.2d 662 (2003); *McLain v. Ortmeier*, 259 Neb. 750, 612 N.W.2d 217 (2000). Here, the jury was instructed that Roth had the burden of proving intentional or reckless conduct on the part of Wiese that "was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and is to be regarded as atrocious and utterly intolerable in a civilized community." This instruction was consistent with our case law, as cited above, and with Restatement (Second) of Torts § 46, comment *d.* (1965). The trial court did not err in refusing to give the tendered instruction.

### (ii) Instruction on Damages

The district court instructed the jury that if it decided in favor of Roth, it could consider the following factors in determining her damages:

1. The nature and extent of the injury, including whether the injury is temporary or permanent;

2. The reasonable value of the medical, psychiatric, and mental health counseling care and supplies reasonably needed by and actually provided to the plaintiff and reasonably certain to be needed and provided in the future;

3. The physical pain and mental suffering the plaintiff has experienced and is reasonably certain to experience in the future . . . .

Wiese objected on grounds that the evidence did not warrant instructing the jury as to permanent injury, future treatment, and future pain and suffering. Wiese contends that the trial judge erred in overruling this objection and giving the instruction.

We conclude that this instruction was warranted by the evidence. Lazere testified that Roth was in the second stage of a three-stage recovery process and that she expected to continue treating her in the future. There was evidence of the fair and reasonable cost of professional services which Lazere and Van Dyke had provided to Roth in her treatment to date. There was also testimony that Roth suffers from chronic, longstanding disorders which intensified after the 2002 contacts by Wiese.

### 4. AMOUNT OF DAMAGES

#### (a) Standard of Review

The amount of damages to be awarded is a determination solely for the fact finder, and its action in this respect will not be disturbed on appeal if it is supported by evidence and bears a reasonable relationship to the elements of the damages proved. *Wendeln v. Beatrice Manor, ante* p. 373, 712 N.W.2d 226 (2006); *Genthon v. Kratville,* 270 Neb. 74, 701 N.W.2d 334 (2005).

#### (b) Analysis

An award of damages may be set aside as excessive or inadequate when, and not unless, it is so excessive or inadequate as to be the result of passion, prejudice, mistake, or some other means not apparent in the record. *In re Petition of Omaha Pub. Power Dist.,* 268 Neb. 43, 680 N.W.2d 128 (2004). With regard to the amount of damages sustained, the plaintiff is simply required to offer sufficient proof of damages so that the jury

could reach its award without awarding an uncertain, speculative recovery. See *Nichols v. Busse*, 243 Neb. 811, 503 N.W.2d 173 (1993). The amount of damages for pain, suffering, and emotional distress inherently eludes exact valuation. *Id.* As a general rule, the law gives the jury the right to determine the amount of recovery in cases such as this, and if the verdict is not so disproportionate to the injury as to disclose prejudice and passion, it will not be disturbed. *Id.*

Roth presented evidence regarding the cost of her mental health treatment with Lazere and Van Dyke. Specifically, she incurred nine charges of $100 for her time with Lazere and two charges of $195 each for her time with Van Dyke. She also presented evidence of significant emotional pain and suffering, including fear, depression, anxiety, and the disruption of relationships with members of her immediate family. In *Bradley T. & Donna T. v. Central Catholic High Sch.*, 264 Neb. 951, 653 N.W.2d 813 (2002), the plaintiff was the victim of a sexual assault and experienced many of the same forms of emotional injury suffered by Roth. We held that a verdict of $125,000 was not excessive. Here, there is evidence that Wiese's conduct in 2002 caused Roth to relive the emotional trauma of multiple sexual assaults during her childhood, resulting in similar symptoms. The valuation of such matters is uniquely within the province of the jury. Based upon our review of the record, we cannot say that the verdict is so disproportionate to the injury as to be the product of prejudice or passion, and we therefore conclude that the verdict was not excessive as a matter of law.

### 5. Rulings on Trial and Posttrial Motions

#### (a) Standard of Review

A directed verdict is proper at the close of all the evidence only when reasonable minds cannot differ and can draw but one conclusion from the evidence, that is, when an issue should be decided as a matter of law. *LeRette v. American Med. Security*, 270 Neb. 545, 705 N.W.2d 41 (2005). To sustain a motion for judgment notwithstanding the verdict, the court resolves the controversy as a matter of law and may do so only when the facts are such that reasonable minds can draw but one conclusion. *Id.* A motion for new trial is addressed to the discretion of the trial

court, whose decision will be upheld in the absence of an abuse of that discretion. *Kant v. Altayar*, 270 Neb. 501, 704 N.W.2d 537 (2005); *Smith v. Colorado Organ Recovery Sys.*, 269 Neb. 578, 694 N.W.2d 610 (2005).

### (b) Analysis

Because we conclude that the evidence was sufficient to sustain the verdict, it necessarily follows that the district court did not err in overruling the motion for a directed verdict made at the close of Roth's case in chief and renewed at the close of trial. For the same reason, there was no error in overruling the motion for judgment notwithstanding the verdict. Because we conclude that the verdict was not excessive and the district court did not err in ruling on evidence or instructing the jury, we conclude that it did not abuse its discretion in overruling the motion for new trial.

### IV. CONCLUSION

For the foregoing reasons, we find no error in the proceedings before the district court and therefore affirm its judgment in favor of Roth.

AFFIRMED.

WRIGHT, J., not participating.