REBECCA HIGGINBOTHAM, APPELLANT, V.
BENJAMIN SUKUP, APPELLEE.
737 N.W.2d 910

Filed July 24, 2007.    No. A-06-624.

Kathleen Koenig Rockey and Christopher C. Hilkemann, of Copple, Rockey & McKeever, P.C., L.L.O., for appellant.

Todd B. Vetter, of Fitzgerald, Vetter & Temple, for appellee.

INBODY, Chief Judge, and SIEVERS and CASSEL, Judges.

INBODY, Chief Judge.

## INTRODUCTION

Following a jury trial, Rebecca Higginbotham was awarded $6,464.58 in damages against Benjamin Sukup. The district court for Madison County, Nebraska, overruled Higginbotham's motion for new trial on the basis that the trial court erred in refusing to give one of her proposed jury instructions, and Higginbotham has appealed. For the reasons set forth herein, we reverse the judgment of the district court and remand the cause for a new trial.

## STATEMENT OF FACTS

On August 5, 2004, Higginbotham filed a complaint in the district court, alleging that she had been injured in a car accident due to Sukup's negligence. Specifically, Higginbotham claimed:

> On or about the 30[th] day of August, 2000, [Higginbotham] was operating a 1995 Ford Taurus automobile in an easterly direction near the location of the 400 Block of East Norfolk Avenue [in Norfolk, Nebraska]. At the same time, [Sukup] was also operating a 1995 Ford Aerostar van in a[n] easterly direction along Norfolk Avenue. [Higginbotham] slowed to stop her vehicle to make a left turn utilizing her turn signal and signaling her intention to turn left to traffic to the front and rear of her automobile. Thereafter, [Sukup's] vehicle struck the rear of [Higginbotham's] vehicle as [she] was waiting to make a lawful left turn.

Higginbotham claimed that Sukup was negligent by failing to exercise proper control over his vehicle, by failing to operate the vehicle at a safe speed for the conditions, and for failing to stop in order to avoid colliding with Higginbotham's vehicle.

Higginbotham claimed that she suffered injuries to her neck, including severe and persistent neck and head pain, whiplash,

and cervical strain, and carpal tunnel syndrome. She alleged that she had sustained $16,059.55 in medical expenses and that she would continue to incur medical expenses in the future. She also alleged that she had incurred lost wages in the amount of $5,134.13. Thus, Higginbotham prayed for $21,193.68 in specific damages, as well as for general damages, costs, and any further relief the court deemed appropriate. On November 4, 2004, Sukup filed his answer, denying each and every allegation made by Higginbotham and asking the district court to dismiss the complaint. On May 31, 2005, Sukup filed an "Admission of Fault," in which he admitted fault in the case "but denie[d] the nature, extent, and amount of damages asserted by" Higginbotham. On August 31, Sukup filed an "Offer to Confess Judgment," in which he "offer[ed] to confess Judgment in open Court for the total sum of $40,000.00, inclusive of court costs."

A jury trial was held in the instant case beginning on March 15, 2006. Higginbotham testified with regard to the injuries she sustained, the pain she continued to suffer from at the time of trial, and the wages she lost as a result of the accident. She generally conceded she had suffered from previous neck stiffness and soreness since approximately 1990, but claimed that she would receive chiropractic adjustments for her neck pain and that her neck would feel fine after the adjustments. Higginbotham stated that she had been suffering from constant neck pain since the time of the August 30, 2000, accident and stated that she was still undergoing physical therapy for the neck injury. She stated that she had no neck pain or soreness immediately prior to the accident, but that she had suffered from soreness and stiffness in her neck and shoulder area ever since the accident.

Numerous depositions from doctors who had treated or examined Higginbotham were read into evidence at trial, and numerous exhibits were entered into evidence as well. Specific evidence relevant to our examination of the issues in this case will be discussed as necessary in the analysis section of this opinion.

On March 16, 2006, a jury instruction conference was held. The following colloquy was had between the trial court, Higginbotham's attorney, and Sukup's attorney:

THE COURT: Then that only leaves [NJI2d Civ.] 4.09 to discuss. So . . . you [Higginbotham's attorney] have included the paragraph, "If you cannot separate damages caused by the preexisting condition" [as the second paragraph of Higginbotham's proposed jury instruction No. 2]; is that right?

[Higginbotham's attorney]: I'm asking that that be included, Your Honor.

THE COURT: All right . . . why don't we start with your argument first.

[Higginbotham's attorney]: Well, Your Honor, the evidence in this case is that [Sukup] has spent a lot of time trying to emphasize the fact that [Higginbotham] has had a preexisting medical history, and has had a preexisting condition. And it seems that [Sukup] cannot have his cake and eat it too. If you want to complain about [Higginbotham's] having a preexisting condition, then I think you have to deal with the fact that you might have to deal with a 4.09 instruction that includes this second paragraph.

The fact that [Higginbotham] may have said she recovered from prior injuries, doesn't change the fact that there's evidence in the record, and it's actually been presented at times by [Sukup], that [Higginbotham] had a degenerative condition in her neck. It seems to me that this is precisely the type of case that we would look to in applying the second paragraph of 4.09 given the objective evidence of that, and the history of prior injury that [Higginbotham] has sustained to the neck has been documented in her medical history.

To the extent that the instruction — I think the instruction is designed for cases just like this one, where you might have a condition that flares up or waxes and wanes, use whatever phrase you like, from time to time, and you have a situation where you have a traumatic event that causes a condition that may have been relatively nonsymptomatic to become symptomatic. In the last deposition that we read today, that's the terminology used by Dr. [Michael H.] McGuire. This is symptomatic. It causes pain and it is

symptomatic. I think this is exactly the type of fact pattern where this type of instruction should be given.

I would strongly suggest that the court consider using the second paragraph of 4.09.

[Sukup's attorney]: Your Honor, I strongly disagree. I previously provided to the court a brief on this issue. I don't get this degenerative condition. [Higginbotham] brought it up so we had to address it. We established that Dr. [C. Robert] Adams is the only one saying that a possible disk was injured here.

We had to bring up the preexisting degenerative disk to show that he was wrong because he didn't know about the preexisting degenerative disk. I'm not here saying that her condition is going downhill because of her degenerative condition. The only reason that was brought up is to show Dr. Adams was wrong.

Now, getting to 4.09, the second [paragraph]. It's only appropriate when you have an injury to someone where they have a preexisting condition that is causing a downfall in their condition, and an injury to it that's — and they are so interwoven and intertwined that you can't separate them. The evidence is clear in this case, and if you instruct without that, the jury's finding is going to be the same. If they believe [Sukup's] evidence, then [Higginbotham] had a temporary cervical strain and everything is resolved and she's back to where she was.

If you instruct without it and they believe [Higginbotham], then everything that she has now isn't related to this accident. So you don't need the second [paragraph] in this case, because without it they are going to be appropriately instructed. I guess the instructions don't suggest or recommend it, and I don't think this is a case where it belongs.

. . . .

[Higginbotham's attorney]: Well, the instructions do suggest it because it is an optional provision in [the Nebraska Jury Instructions] that has been determined could be appropriate in certain circumstances. The notion, I guess, that — I guess what — the point I'm trying to get across here is as we so often hear, the defendant takes

the plaintiff as they find her. And in this case the defendant[, Sukup,] wants to present an argument to the jury, and will do so tomorrow, that at a certain point in time after the cervical strain healed at approximately a two-year period of time, [the plaintiff, Higginbotham,] was back to where she was before the accident occurred. And our position is that it is very difficult to make that definitive separation. And even Dr. McGuire, in his deposition, admitted it's difficult to make that separation. And if the jury thinks it can't make that separation, then I think the jury is properly instructed in this by utilizing this second [paragraph] in 4.09.

That is the defendant's theory, but nonetheless the damages that are — these conditions [Higginbotham] has are, I agree with [Sukup's attorney], interwoven with her other condition. And I think the jury needs to know that the defendant takes the plaintiff as they find her. And if [the jury] can't separate out those damages caused by the pre-existing condition, then the defendant is liable for all of them. That's the law of the state.

[Sukup's attorney]: And I disagree with [Higginbotham's attorney]. The instructions specifically say that the second paragraph should not be routinely given. It should be rarely given. And this is not the case for it. This jury is going to be appropriately instructed in the law based upon the evidence before them, using the standard instruction without modifying it to add the damage apportion paragraph so you can get up there and argue to tag it all.

If they find — if their finding is this accident is the cause of [Higginbotham's] continued complaints and problems, then they'll be appropriately instructed even without the paragraph.

THE COURT: My ruling is going to be that I think that situation in [*Gustafson v. Burlington Northern RR. Co.*, 252 Neb. 226, 561 N.W.2d 212 (1997),] is probably the most applicable apportionment instruction appropriate where there is evidence of a preexisting condition, but if the degree to which the condition may have been aggravated could not be determined, an apportionment

> instruction in the absence of proof of aggravation. I think that's where we're at.
>
> Emotionally, I probably agree with [Higginbotham's attorney], because I don't think [Sukup's attorney] ought to be able to have his cake and eat it too, which he's trying to have here. But on the other hand, the situation as far as proof is concerned, I don't think it's clear here that there's a preexisting condition, and therefore I don't think it's appropriate to give the second paragraph. So I'm going to deny [Higginbotham's] motion and instruct as requested by [Sukup].
>
> However — well, that's what I'm going to do.

The case was submitted to the jury on March 17, 2006. After deliberations, the jury returned that same day with a verdict in favor of Higginbotham in the amount of $6,464.58. On March 27, Higginbotham filed a motion for new trial, alleging that the trial court improperly instructed the jury on the issue of damages. On May 10, following a hearing on the motion for new trial, the trial court overruled Higginbotham's motion. Higginbotham has timely appealed to this court.

## ASSIGNMENTS OF ERROR

Higginbotham alleges that the trial court committed reversible error in refusing to give one of her proposed jury instructions and in overruling her motion for a new trial.

## STANDARD OF REVIEW

■ Whether a jury instruction given by a trial court is correct is a question of law. When reviewing questions of law, an appellate court has an obligation to resolve the questions independently of the conclusion reached by the trial court. *Roth v. Wiese*, 271 Neb. 750, 716 N.W.2d 419 (2006).

■ To establish reversible error from a court's failure to give a requested jury instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction was warranted by the evidence, and (3) the appellant was prejudiced by the court's failure to give the requested instruction. *Id.*

■ A motion for new trial is addressed to the discretion of the trial court, whose decision will be upheld in the absence of an abuse of that discretion. *Epp v. Lauby*, 271 Neb. 640, 715 N.W.2d 501 (2006); *Kant v. Altayar*, 270 Neb. 501, 704 N.W.2d 537 (2005).

## ANALYSIS

*Improper Jury Instructions.*

Higginbotham first contends that the district court committed reversible error when it refused to give one of her proposed jury instructions. Higginbotham's proposed jury instruction No. 2 provided as follows:

> There is evidence [Higginbotham] had a neck condition prior to the date of the collision. [Sukup] is liable only for any damages that you find proximately caused by the collision.
>
> If you cannot separate damages caused by the preexisting condition from those caused by the collision, then [Sukup] is liable for all of those damages.

This instruction is essentially identical to that seen in NJI2d Civ. 4.09. The second paragraph of Higginbotham's proposed instruction is essentially identical to the "Suggested Instruction," dealing with apportionment, as seen in part IIB of the comment to NJI2d Civ. 4.09.

Instead of instructing the jury with Higginbotham's proposed jury instruction No. 2, the trial court instructed the jury as requested by Sukup, which was substantially similar to Higginbotham's proposed instruction except for the omission of the second paragraph of the proposed instruction.

■ Jury instructions are subject to the harmless error rule, and an erroneous jury instruction requires reversal only if the error adversely affects the substantial rights of the complaining party. *David v. DeLeon*, 250 Neb. 109, 547 N.W.2d 726 (1996). To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that the tendered instruction is the correct statement of law, that the tendered instruction is warranted by the evidence, and that the appellant was prejudiced by the court's refusal to

give the tendered instruction. *Id.* A jury instruction that misstates the burden of proof has a tendency to mislead the jury and is erroneous. *Id.*

The right of a person suffering from a disease, who is injured by reason of the negligence of another, to recover for all damages proximately resulting from the negligent act includes the right to recover for an aggravation of the preexisting disease. *Id.* The plaintiff has the burden of proving duty, breach, causation, and resultant harm to recover in a suit in negligence. *Id.* The plaintiff is not, however, required to provide a precise line between the damages directly related to the accident and any preexisting physical or mental condition the defendant can exhume as a precondition for recovering any damages at all. *Id.* Once the plaintiff presents evidence from which a jury reasonably can find that damages were proximately caused by the tortious act, the burden of apportioning damages resulting from the tort rests squarely on the defendant. *Id.*

If a plaintiff has a preexisting condition and the defendant's conduct resulted in greater damages because of that preexisting condition, the defendant is nonetheless liable for all damages proximately caused by the defendant's conduct. *Castillo v. Young*, 272 Neb. 240, 720 N.W.2d 40 (2006). The comment to NJI2d Civ. 4.09 states that the "Suggested Instruction" dealing with apportionment "should not be given routinely, but rarely." Further, this sentence is appropriate only where the plaintiff has established injury and causation and there remains only a question of apportioning the damages between the preexisting injury and the defendant's negligence. *Macholan v. Wynegar*, 245 Neb. 374, 513 N.W.2d 309 (1994).

It is undisputed that Higginbotham suffered from a preexisting neck condition. In fact, both parties put on evidence to suggest that she suffered from such an affliction. It is also true that more than one of the doctors who testified by deposition indicated that any damages that Higginbotham suffered to her neck as a result of the accident caused by Sukup had cleared up by the time of trial and that any neck problems she continued to have were not the result of the accident.

However, Higginbotham did in fact present evidence that her preexisting condition had been exacerbated by the accident and

that she continued to suffer from this exacerbation. The deposition of Dr. George Greene, taken on December 12, 2005, was read into evidence at the trial. Dr. Greene stated that he examined Higginbotham on two occasions, on December 8, 2000, and on September 20, 2001. Dr. Greene indicated that he took a medical history from Higginbotham. Dr. Greene noted that Higginbotham had been referred to him for neck pain arising out of her August 30, 2000, car accident and that "[i]t was [his] impression that she had had a strain of her neck that was causing her neck and shoulder pain." Dr. Greene testified that it was his "impression that [Higginbotham's cervical strain] was as a result of her motor vehicle accident."

Dr. Greene stated that Higginbotham had suffered a "severe cervical strain," which he characterized as "a strain of the muscles, joints, and ligaments in the neck region." He further stated that in his experience, surgery would not be an option to reduce Higginbotham's pain. Dr. Greene stated that he "suggested [to Higginbotham,] since her neck pain had been ongoing and had not been relieved with other nonoperative methods, that she consider evaluation at a comprehensive pain management clinic."

Dr. Greene stated in his deposition that he had assigned Higginbotham an impairment rating of 4 percent of the whole person, per the "AMA Guidelines to the Evaluation of Permanent Impairment." He stated that the impairment rating was "related to the unoperated soft tissue lesion and cervical spine with none to minimal degenerative changes on the structural test." Dr. Greene also interviewed Higginbotham on July 7, 2003, and he stated that Higginbotham was still suffering from neck pain at that time. Dr. Greene reiterated that he was of the opinion that Higginbotham had "experienced a cervical strain as a result of her motor vehicle accident." He stated that he did not have an opinion regarding whether Higginbotham's injury was permanent, and that the neck condition was not degenerative, but that he "still [thought] that she may derive some benefit from evaluation in a comprehensive pain management program."

On cross-examination, Dr. Greene stated that Higginbotham had not informed him that she had a preexisting neck condition and that he did not recall Higginbotham's telling him that

she had constant neck pain and stiffness. He stated that he had given Higginbotham a permanent impairment rating as a result of the cervical strain. He also explained that he did not have an opinion regarding whether Higginbotham's injury was permanent or not, due to his "understanding she has not completed a course of treatment for her cervical strain," and that he was "reluctant to assign her permanency until she has completed a course of treatment."

Dr. Greene again reiterated that as a result of the accident, Higginbotham suffered a cervical strain "which[,] in view of the other information available, may have exacerbated a pre-existing condition." Dr. Greene conceded that Higginbotham had not told him about her prior neck pain, but stated that he still believed her current neck pain was an aggravation of her previous condition: "Based on the history that she gave me that her neck pain — she had neck pain following her motor vehicle accident, so I must rely on what she told me that suggested that is more neck pain than she had previously." Dr. Greene reiterated that he believed Higginbotham's current neck pain was causally related to the accident, but conceded that "[b]ased on the additional information [he learned on the day his deposition was taken, concerning Higginbotham's] pre-existing neck pain, all of her current neck pain may not be related to her motor vehicle accident."

Additionally, the deposition of Dr. Curtis Meyer, taken on December 15, 2005, was read into evidence at trial. Dr. Meyer stated that he had been Higginbotham's treating chiropractor since February 2003. Dr. Meyer stated that Higginbotham had primarily received care for her neck. Dr. Meyer stated that his opinion regarding Higginbotham's neck was as follows:

> The care that I'm offering, based on the history that I read, and the examinations that I read of, and the medical opinions that I read of, and my objective findings say that [Higginbotham's] neck was hurt and that she has sought care from a variety of doctors for that and that that stems from an incident in 2000.
>
> . . . .
>
> . . . I have a variety of diagnoses as you can see through this regimen of care, all of which come into the same

cervical and thoracic area that she was originally complaining of. My care at this point was less acute than that which I read about in the earlier days. So the strain/sprain incident and diagnoses that I read of, I scaled down to sometimes myalgias which was just muscle pain, sometimes dysfunctions, it didn't work well. And so my — my diagnoses are maybe less, not as heavy; not as heavy, and the court — for the court to understand, she wasn't in as bad of shape when I got to her or when she got to me as she was when she was first seen.

Dr. Meyer continued to state that Higginbotham "was hurt in the incident of 2000 and that some of the — the complaints, subjective complaints even yesterday stem from that."

Dr. Meyer stated that he had reviewed the records of Dr. James Thor, Higginbotham's chiropractor at the time of the accident. Dr. Meyer stated that he "looked at [Higginbotham's] records prior to [the 2000 accident], but did not delve" into them, and that he had examined the records after the accident as well. Dr. Meyer stated that his treatment of Higginbotham, with the exception of a few visits, had been "necessarily incurred as a result of the automobile accident she was involved in in August of 2000." Dr. Meyer gave his opinion regarding Higginbotham's future care needs:

Based on the patient's needs over the last nearly three years, we're not that far from February now, the patient has required periodic care as we've discussed in short small blocks, sometimes based on incidents, sometimes not based on an incident. It would then be reasonable for me to think that with what had occurred or has occurred that she may continue to seek that form of care in small segmental blocks. It does look good for her, though, that her care requirements for this year were much less than they had been in the previous two. So I think that is very positive for her in her trying to achieve some quality of life.

He stated that Higginbotham would probably continue to require periodic treatment, but would not be on a scheduled regimen of chiropractic treatment.

On cross-examination, Dr. Meyer stated that Higginbotham did not have any future scheduled appointments with him, as

they were "on an as-needed basis." Dr. Meyer stated that he did not have an opinion on the care of Higginbotham's neck prior to the 2000 accident and that he did not know if Higginbotham "had flare-ups in her neck that subsided and then flared-up and subsided before this motor vehicle accident." Dr. Meyer also conceded that he did not know "if during the care and treatment . . . before the motor vehicle accident of August 30, 2000, [Higginbotham] ever had pain" in her cervical spine or at the thoracic level. He also did not know if Higginbotham reported to Dr. Thor that she suffered from "constant neck pain and stiffness" or if Higginbotham had been diagnosed with a chronic condition of her neck. However, we note that Dr. Meyer never changed his opinion that Higginbotham's neck problems that he had treated were at least partly the result of the 2000 accident.

As noted earlier, once a plaintiff presents evidence from which a jury reasonably can find that damages were proximately caused by a tortious act, the burden of apportioning damages resulting from the tort rests squarely on the defendant. It is apparent from Dr. Greene's testimony, as well as that of Dr. Meyer, that Higginbotham presented evidence from which a jury could reasonably find that damages were proximately caused by a tortious act. Therefore, the burden of apportioning damages was squarely on Sukup.

The apportionment paragraph included in Higginbotham's proposed instruction is appropriate to include only where the plaintiff has established injury and causation and there remains only a question of apportioning the damages between the pre-existing injury and the defendant's negligence. Although more than one of the doctors' opinions entered into evidence suggested that any damages suffered by Higginbotham due to the accident had cleared up prior to trial, Dr. Greene's opinion was that Higginbotham continued to suffer damages to her neck as a result of the accident; Dr. Meyer opined similarly. Dr. Meyer never changed his opinion, and while Dr. Greene's opinion changed slightly after he learned of Higginbotham's preexisting neck condition, he maintained his position that Higginbotham suffered a cervical strain as a result of the accident. Dr. Greene specifically stated that "all of her current neck pain may not be related to her motor vehicle accident," indicating that at least

part of Higginbotham's suffering at the time of trial was still due to the cervical strain she suffered in the accident.

Thus, at least some of the evidence presented at trial indicates that apportionment is not clear and that Higginbotham continues to suffer due to the accident. While Dr. Greene and Dr. Meyer may be in the minority, whether their testimony was credible or not is not for us, or the district court, to decide; rather, it is a question for the jury. Therefore, it is apparent from the record before us that Higginbotham's proposed instruction was warranted by the evidence presented at trial.

To establish reversible error from a court's failure to give a requested jury instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction was warranted by the evidence, and (3) the appellant was prejudiced by the court's failure to give the requested instruction. *Roth v. Wiese*, 271 Neb. 750, 716 N.W.2d 419 (2006). Higginbotham's proposed instruction was a correct statement of the law and, as previously stated, was warranted by the evidence. It is also apparent that Higginbotham was prejudiced by the court's failure to give her proposed instruction. A jury instruction that misstates the burden of proof has a tendency to mislead the jury and is erroneous. *David v. DeLeon*, 250 Neb. 109, 547 N.W.2d 726 (1996). The jury should have been instructed that if it was unable to separate the damages caused by the preexisting condition from those caused by the collision, then Sukup was liable for all Higginbotham's damages. Higginbotham was clearly prejudiced by the trial court's failure to properly instruct the jury. Accordingly, we find that the trial court's failure to give Higginbotham's proposed instruction was reversible error.

*Denial of Motion for New Trial.*

Higginbotham has also assigned that the trial court erred in overruling her motion for a new trial, on the basis that the court erred in failing to give her proposed jury instruction. Since we have found that the trial court committed reversible error in failing to give Higginbotham's proposed jury instruction, it follows that the court likewise abused its discretion in failing to grant her a new trial on that basis.

## CONCLUSION

We find that the district court committed reversible error when it refused to give Higginbotham's proposed jury instruction, and accordingly, we reverse the judgment of the district court and remand the cause back to the district court for a new trial.

REVERSED AND REMANDED FOR A NEW TRIAL.