Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
03/14/2022 08:08 AM CDT

TABE DE VRIES, AN INDIVIDUAL, AND BONNIE J.
DE VRIES, AN INDIVIDUAL, APPELLEES AND
CROSS-APPELLANTS, v. L & L CUSTOM
BUILDERS, INC., A NEBRASKA
CORPORATION, APPELLANT
AND CROSS-APPELLEE.

___ N.W.2d ___

Filed December 17, 2021.   No. S-20-577.

1. **Verdicts: Appeal and Error.** When reviewing a jury verdict, the appellate court considers the evidence and resolves evidentiary conflicts in favor of the successful party.

2. **Verdicts: Juries: Appeal and Error.** A jury verdict may not be set aside unless clearly wrong, and it is sufficient if there is competent evidence presented to the jury upon which it could find for the successful party.

3. **Verdicts: Juries: Presumptions: Appeal and Error.** When the jury returns a general verdict for one party, an appellate court presumes that the jury found for the successful party on all issues raised by that party and presented to the jury.

4. **Verdicts: Juries: Presumptions: Words and Phrases: Appeal and Error.** The "general verdict" rule, which is also referred to as the "two issue" rule, is a policy rule which provides that where a general verdict is returned for one of the parties, and the mental processes of the jury are not tested by special interrogatories to indicate which issue was determinative of the verdict, it will be presumed that all issues were resolved in favor of the prevailing party, and, where a single determinative issue has been presented to the jury free from error, any error in presenting another issue will be disregarded.

5. **Trial: Appeal and Error.** One cannot silently tolerate error, gamble on a favorable result, and then complain that one guessed wrong.

6. **Appeal and Error.** An appellate court will not consider an issue on appeal that was not presented to or passed upon by the trial court.

7. **Courts: Judgments: Appeal and Error.** A motion for reconsideration, which is considered nothing more than an invitation to the court to consider exercising its inherent power to vacate or modify its own judgment, is insufficient for purposes of asking a trial court to pass upon an issue in order to properly preserve it for appeal.

8. **Limitations of Actions: Appeal and Error.** The point at which a statute of limitations begins to run must be determined from the facts of each case, and the decision of the district court on the issue of the statute of limitations normally will not be set aside by an appellate court unless clearly wrong.

9. **Directed Verdict: Appeal and Error.** In reviewing a trial court's ruling on a motion for directed verdict, an appellate court must treat the motion as an admission of the truth of all competent evidence submitted on behalf of the party against whom the motion is directed; such being the case, the party against whom the motion is directed is entitled to have every controverted fact resolved in its favor and to have the benefit of every inference which can reasonably be deduced from the evidence.

10. **Judgments: Verdicts: Appeal and Error.** Review of a ruling on a motion for judgment notwithstanding the verdict is de novo on the record.

11. **Jury Instructions: Appeal and Error.** Whether a jury instruction is correct is a question of law, which an appellate court independently decides.

12. ____: ____. Failure to object to jury instructions after they have been submitted to counsel for review or to offer more specific instructions if counsel feels the court-tendered instructions are not sufficiently specific precludes raising an objection on appeal.

13. ____: ____. Jury instructions are subject to the harmless error rule, and an erroneous jury instruction requires reversal only if the error adversely affects the substantial rights of the complaining party.

14. **Jury Instructions: Proof: Appeal and Error.** In an appeal based on a claim of an erroneous jury instruction, the appellant has the burden to show that the questioned instruction was prejudicial or otherwise adversely affected a substantial right of the appellant.

15. **Jury Instructions: Appeal and Error.** Where jury instructions are claimed deficient on appeal and such issue was not raised at trial, an appellate court reviews for plain error.

16. **Judgments: Appeal and Error.** An appellate court reviews a denial of a motion to alter or amend the judgment for an abuse of discretion.

17. **Damages: Appeal and Error.** On appeal, the fact finder's determination of damages is given great deference. The amount of damages to be awarded is a determination solely for the fact finder, and its action in

this respect will not be disturbed on appeal if it is supported by evidence and bears a reasonable relationship to elements of damages proved.

18. **Damages.** While the amount of damages presents a question of fact, the proper measure of damages presents a question of law.

19. **Damages: Appeal and Error.** An award of damages may be set aside as excessive or inadequate when, and not unless, it is so excessive or inadequate as to be the result of passion, prejudice, mistake, or some other means not apparent in the record.

20. **Contracts: Compromise and Settlement: Appeal and Error.** Allocation of a settlement agreement is reviewed for an abuse of discretion.

21. **Limitations of Actions: Breach of Warranty: Contractors and Subcontractors.** Where the basis of the claim is improper workmanship resulting in defective construction, under either negligence or breach of the implied warranty to perform in a workmanlike manner, the statute of limitations of Neb. Rev. Stat. § 25-223 (Reissue 2016) runs from the date of substantial completion of the project, not the date of any specific act which resulted in the defect.

22. **Equity: Estoppel: Limitations of Actions.** Equitable estoppel may be successfully asserted to avoid the statute of limitations defense when one lulls his or her adversary into a false sense of security, thereby causing that person to subject his or her claim to the bar of the statute of limitations, and then pleads the very delay caused by his or her conduct as a defense to the action when it is filed.

23. **Estoppel: Limitations of Actions.** Estoppel does not extend the statute of limitations but prevents a party from pleading and utilizing the statute as a bar.

24. **Summary Judgment: Appeal and Error.** The denial of a motion for summary judgment is neither appealable nor reviewable.

25. **Estoppel.** When a plaintiff raises estoppel to avoid or rebut an affirmative defense that has been alleged in a responsive pleading, evidence of estoppel is generally admissible without being formally pled.

26. **Jury Instructions: Statutes.** Directly quoting an applicable statute is a permissible form of jury instruction.

27. **Jury Instructions.** Where a general charge fairly presents the case to the jury, it is not error for the trial court, in the absence of a request for a more specific instruction, to fail to give a more elaborate one.

28. **Jury Instructions: Proof: Appeal and Error.** To establish reversible error from a court's failure to give a requested jury instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction was warranted by the evidence, and (3) the appellant was prejudiced by the court's failure to give the requested instruction.

29. **Jury Instructions: Appeal and Error.** If the instructions given, which are taken as a whole, correctly state the law, are not misleading, and adequately cover the issues submissible to a jury, there is no prejudicial error concerning the instructions and necessitating a reversal.

30. **Equity: Estoppel: Pretrial Procedure.** Discovery periods and equitable estoppel involve two different doctrines.

31. **Equity: Estoppel: Limitations of Actions.** Equitable estoppel is not based upon the construction of a statute of limitations, but on the common law.

32. **Pleadings: Proof.** The party who pleads a setoff bears the burden of proving it.

33. **Verdicts: Remittitur.** Where a verdict is excessive, but not so much as to indicate passion or prejudice on the part of the jury, the error may be corrected by remittitur, if the excess can be estimated with reasonable certainty.

34. **Remittitur: Appeal and Error.** An appellate court should order remittitur only when the award is contrary to all reason.

35. **Verdicts: Remittitur.** If there is no method by which a court can rationally ascertain the extent of the excess of a verdict, a remittitur cannot be required, for the reason that under such circumstances, a remittitur is nothing more than a substitution of the judgment of the court for that of the fact finder.

36. **Damages.** Amounts expended to investigate the extent of a defect and determine the proper course of remediation are recoverable damages, not litigation costs.

37. **Damages: Property: Breach of Warranty.** The basic goal of the court for a breach of warranty concerning building construction or injury to a building or other structure is compensation—that is, to award such an amount of money as will restore the injured party to the same property status which he or she occupied immediately prior to the injury.

38. **Damages.** Because the facts vary from case to case, a rule of damages which produces compensation in one case may be overcompensation (or undercompensation) in another case.

39. **Damages: Property.** If, in fact, the cost of repair or restoration exceeds the market value of the property just before the injury, then the proper measure of damages is the market value of the property just before the damages were incurred, less any salvage.

40. **Damages.** Public perceptions of a defect when the evidence demonstrates there is none is an improper basis for recovery.

Appeal from the District Court for Douglas County: J RUSSELL DERR, Judge. Affirmed.

Brian T. McKernan, Robert D. Mullin, Jr., and Matthew G. Munro, of McGrath, North, Mullin & Kratz, P.C., L.L.O., for appellant.

Gregory C. Scaglione, Quinn R. Eaton, Minja Herian, and Cody B. Nickel, of Koley Jessen, P.C., L.L.O., for appellees.

Heavican, C.J., Cassel, Stacy, Funke, Papik, and Freudenberg, JJ., and Weimer, District Judge.

Per Curiam.

## I. INTRODUCTION

The homeowners sued the builder of their house for defects in the construction of the house and in the preparation of the lot it was built on, part of which contains and the other part of which adjoins a riverbank bluff. The jury rendered a general verdict in favor of the homeowners, after finding in a special verdict form that the homeowners' claims were not barred by the statute of limitations. The builder appeals, raising issues pertaining to the statute of limitations and the amount of damages. The homeowners cross-appeal with respect to damages. We affirm the judgment.

## II. BACKGROUND

Tabe de Vries and Bonnie de Vries brought suit on February 15, 2017, against L & L Custom Builders, Inc. (L&L), and Thompson, Dreessen & Dorner, Inc. (TD2). The parties agreed the house was substantially completed in November 2012 for a total price of $847,456.83. The land was purchased for an additional $70,152.61.

### 1. Pleadings

In their operative amended complaint, the de Vrieses alleged they had entered into a contract with L&L to build their home on an 80-foot-high bluff along a riverbend and that L&L assured them the selected site was safe to build on. Before the house was completed, TD2 prepared two reports of "Geotechnical Exploration" in relation to construction on

the site, which indicated bluff failures. The de Vrieses asserted that L&L withheld a TD2 report and that this report was not disclosed to them until May 2016.

The de Vrieses alleged that after repairs were made following a walk-through inspection, a large crack appeared in the basement ceiling in July 2014. This began a series of geotechnical investigation reports by TD2 that recommended continued monitoring and study until a final report on May 20, 2016, suggesting two mechanisms caused the increasing observable distress at the house.

Also in May 2016, the de Vrieses observed that part of the riverbluff had fallen into the river. Subsequently, the de Vrieses discovered that L&L had never installed a "French drain," as L&L had represented.

The de Vrieses alleged that in a meeting between the de Vrieses, L&L, and TD2 on May 24, 2016, L&L and TD2 disagreed as to how to proceed with repairs. L&L pointed out that TD2's sixth report could not explain the cause of all the issues observed with the house. Another meeting between the de Vrieses and L&L took place on July 28, in which L&L continued to disagree with TD2's proposed plan, which led to the de Vrieses' decision to sue.

The de Vrieses alleged, based on these facts, several claims against L&L and TD2, including breach of contract. L&L alleged the statute of limitations as an affirmative defense. TD2 alleged as affirmative defenses the statute of limitations and that any damages suffered by the de Vrieses were caused by the acts or omissions of third parties over which TD2 had no control.

## 2. Motions for Summary Judgment

L&L moved for summary judgment, alleging that there was no genuine issue that the de Vrieses' claims against it were barred by the statute of limitations. TD2 filed a similar motion.

L&L argued at the hearing on the motion that the de Vrieses had knowledge that a problem existed, albeit not the nature of the problem or necessarily that they had a cause of action,

well before the expiration of the 4-year statute of limitations and, indeed, within the first 3 years after construction. Thus, the discovery period did not apply.

With regard to any claim that the statute of limitations was tolled by fraudulent concealment under a theory of equitable estoppel, L&L asserted that the de Vrieses could not invoke the doctrine of equitable estoppel because they did not plead it. Alternatively, L&L asserted that assurances by L&L, that they would make the necessary repairs whenever they were able to discern what precisely the cause of the problem was and what was needed to fix it, were insufficient to support equitable estoppel.

After consideration of all the evidence submitted at the hearing on the motions, the court found there was a genuine issue as to when the de Vrieses reasonably discovered their potential claims and as to whether there was a "continuing representation issue."

The court found it "ironic" that while arguing the de Vrieses should have known the existence of the problem as early as July 2014, L&L and TD2, as professionals in their respective fields, were not themselves able to discover the source of the problem for some time and continued to represent the observed distress as minor and completely normal.

### 3. Settlement With TD2

Shortly before trial was set to begin, the de Vrieses and TD2 filed a joint stipulation to dismiss the de Vrieses' action as against TD2 only, with prejudice. Per the stipulation, the court dismissed the de Vrieses' complaint as against TD2.

L&L did not object to the dismissal and did not move for the de Vrieses to produce the settlement agreement at that time.

The de Vrieses moved in limine to prohibit reference to the jury of their settlement with TD2. L&L agreed with the de Vrieses that it should not be able to mention to the jury that there had been a settlement between the de Vrieses and TD2. However, L&L wished to reserve its rights to question witnesses and bring up that TD2 was a party and had

generated opinions concerning the case, on the grounds that it was relevant to whether L&L had proximately caused any of the damages. The de Vrieses responded that this issue could be explored without mentioning that TD2 had been a party.

The district court ruled that L&L could discuss with witnesses and experts facts and opinions pertaining to L&L's fault, or lack thereof, but not that TD2 was a party and settled. In ruling on the motion in limine, the court observed that L&L had not brought a counterclaim against TD2 on any theory of joint liability.

### 4. Motion in Limine on "Stigma" Damages

The court sustained L&L's pretrial motion in limine to exclude any evidence by the de Vrieses at trial pertaining to its claim of "stigma" damages against L&L. The court described the term "stigma damages" as damages due to diminished market value of the home even after all repairs are made.

The de Vrieses and the court discussed the de Vrieses' intention to present an offer of proof regarding stigma damages. At trial, outside the presence of the jury, the de Vrieses made an offer of proof that their expert witness, an appraiser, would have testified that due to the real estate disclosure statement, the public aspect of the lawsuit, and the visual inspection of the bluff by any potential buyer, the fair market value of the property, even after completion of all corrective work, would be $213,000 less than it would have been but for the defects, as the expert elaborated upon in exhibit 277. Exhibit 277 was not offered or entered into evidence as part of the offer of proof but is found in the bill of exceptions.

### 5. Evidence Presented at Trial

Bonnie testified at trial that she and Tabe decided to work with L&L to build a custom house before deciding on the lot. When they found the lot at issue, before buying it, she looked at it with Eric Lakeman, a co-owner of L&L. Adjoining the lot was a riverbluff, approximately 150 feet away. Bonnie specifically asked Lakeman whether it would be safe to build there,

given that it was a hill alongside a riverbank. Bonnie testified that Lakeman assured her it would be safe to build there and "the bank wasn't a problem." In fact, he told Bonnie he had lived in the area his whole life, and Bonnie said she was assured by Lakeman the bank had not moved. The de Vrieses purchased the lot directly from the owner, along with a separate lot consisting of a 10-foot strip that encompasses the river-bluff. They entered into a contract with L&L to build a house on the lot.

The contract price did not include "landscaping" services. L&L subcontracted with DMS Landscaping (DMS) to construct four retaining walls, but, according to Lakeman, most of the work conducted by DMS was landscaping done through a contract directly with the de Vrieses. Lakeman described this as including the "rough and final grading" of the lot.

Lakeman testified that as a result of the retaining walls, a French drain was required, and that he understood DMS was going to install one. Sometime in 2015 or 2016, however, DMS discovered the French drain had not actually been installed. The owner of DMS testified that all the work DMS did on the de Vrieses' property was supervised and approved by L&L and that L&L was at all times acting as the general contractor. He testified DMS was not responsible for any of the drainage plan or installation of drainage "inside the envelope of the house."

### (a) Preconstruction TD2 Reports From March 2011 and March 2012

TD2 had prepared a geotechnical investigation report on the lot on March 31, 2011, for a different prospective builder in relation to a different prospective client with an expected build of a single-story house with a walkout basement. The lot subject to the report did not contain the 10-foot strip alongside the river, which the de Vrieses acquired as part of their purchase of the land. L&L obtained from TD2 a copy of its report before commencing construction.

TD2 stated in the report that the encountered natural soils were "expected to be suitable for direct support of the structure utilizing shallow spread foundations without the need for improvement of the existing soils." However, TD2 observed "clayey till [that] is known to be swell susceptible" and "recommended that these soils be maintained in a moisture content state at or above optimum moisture before concrete is placed." The 10-page report contained numerous other specifications for proper site preparation for a house on the lot.

TD2 described the bluff along the river near the lot appeared to be "experiencing failure by blocks toppling from the upper zones of the bluff coupled with the debris being eroded and the bluff being undercut by the River." At the time of the report, the lot lines examined were 110 to 200 feet from the bluff. Thus, TD2 did not expect a house built on the lot to "be troubled by slope movements in the near future." But, "over time as the bluff continues to experience failures, the bluff may work towards the lot."

L&L asked TD2 to again inspect the site following excavation and before foundation construction. That inspection led to another report. In this report, dated March 13, 2012, TD2 did not recommend changes from its prior report regarding design and construction of foundation elements. However, it presented an alternative subgrade specification of crushed limestone in lieu of compacted soils.

There was evidence that L&L emailed a copy of the March 2011 report to Tabe in September 2011, but Bonnie testified that neither she nor Tabe recalled receiving the report. The first time she was made aware of it was in May 2016.

(b) Initial Drywall Cracking in 2014

After construction of the house and the de Vrieses had moved in, some drywall cracking appeared. The 1-year walkthrough for the express warranty was conducted by agreement of all parties approximately 17 months after construction was completed. According to Bonnie, Lakeman told her

and Tabe not to worry about the drywall cracks, as they were "settlement" and "cosmetic."

L&L repaired the cracks in June 2014. Lakeman testified that the cracking observed at that time was "[k]ind of standard stuff."

The following month, the de Vrieses noticed a new crack in a downstairs room, and notified L&L. L&L contacted TD2 to look at it.

Lakeman testified that the new crack, which he observed in August 2014, "was a concern of mine" both because it was outside the normal settlement period and because it was an aggressive, c-shaped, jagged crack that was not in a standard location. Lakeman also observed cracking in the tile floor. Bonnie testified, however, that Lakeman assured her and Tabe that the problems were due to normal settlement, saying, "'[d]on't worry about it'" and "'[w]e'll figure it out and take care of it.'" L&L did not object to this testimony.

(c) TD2 Report Dated September 16, 2014

At L&L's request, TD2 conducted a site visit and inspection on August 26, 2014, and prepared a report dated September 16, 2014. The de Vrieses were not billed for these services. In the September 2014 report, TD2 noted apparent settlement on the west exterior wall of the house and the rear patio on the north side. TD2 set forth in the report that it was "important to note that it appears to be a settlement rather than a heave or swell in the soil because of the soil material types encountered at the site." TD2 also stated, "In general terms, the interior distress observed was minor based on my observations and experience."

The report noted that the upper portion of the soil profile around most of the house was "very moist" and that TD2 suspected "this soil material has gained in moisture content from what it was at the time of construction." It did not perceive this as causing the observed distress but suggested that "some efforts be made to promote a decrease in the exterior soil

moisture, which I would expect to be related to slowing down or reducing future cracking and distress."

TD2 recommended monthly monitoring of some of the more prominent cracks over a period of 6 months "to better gauge how movements may be occurring." TD2 elaborated that the goal of the monitoring program is to define the rate and magnitude of any continuing movements to justify the level and timing of any repairs that can or should be made. TD2 summarized that "the distress observed at our inspection visit is considered minor at this time" and "interpreted to be due to settlement and not heave."

Bonnie testified that she was provided a copy of the report and understood at that time that the observed cracking was part of the normal settlement process.

### (d) 2014 Additional Work by DMS

Bonnie testified that Lakeman and the owner of DMS conferred at the house as to how to best address the observed exterior moisture in the soil near the house. After that discussion, DMS removed mulch, resloped some of the landscaping, and added a downspout. DMS' work was completed in October or November 2014.

### (e) 2015 Monitoring

Lakeman testified that in accordance with TD2's recommendations, in 2014 and 2015, he made trips to the de Vrieses' house to monitor any movement. He observed that cracks were increasing in size and that more cracks were developing around the house. Bonnie testified that they waited and monitored for about a year after the 2014 report.

### (f) Engineering Report Dated June 2, 2015

At L&L's direction, the house was inspected by Donan Engineering Co., Inc (Donan). L&L's relationship with Donan was not fully explained. The de Vrieses were apparently not charged for this inspection. Lakeman assisted in the inspection by pointing out areas of concern. The Donan report,

completed on June 2, 2015, noted cracking in the basement floor and in the drywall on the walls that was continuing and progressing. Donan concluded that the cause of the cracks in the drywall on the walls and ceilings and displacement of concrete floors and slabs was "settlement due to 'hillside creep.'" Donan described that the house was constructed on a steep embankment and that "[s]oils on steep slopes are prone to a phenomenon known as hillside creep, where the soils slowly move down the hill." The Donan report set forth that settlement would continue until the soil achieves equilibrium and that stability of the foundation could be achieved by "supporting the foundation of the house on soils below the soils subject to hillside creep with hydraulic piers and tiebacks."

### (g) TD2 Report Dated August 18, 2015

L&L requested that TD2 make another site visit, which occurred on August 5, 2015, and that it prepare an updated report, which was issued on August 18. TD2 reviewed the Donan report and found its conclusions regarding hillside creep as the mechanism causing the distress in the house "difficult to justify." TD2 expressed the opinion that the "present observable distress . . . is less than moderate severity." TD2 recommended "an additional level of study be used to determine what and how structural and non-structural elements of the house may or may not be moving." This required repeated surveys over time, "because a single measuring occasion does not provide adequate information for a conclusion" and because monitoring will "provide an indication of slab or structural wall movement which better identifies the results of the cause of the distress."

### (h) September 2015 Meeting

Bonnie was provided with a copy of the Donan report in August 2015, but testified, without objection, that L&L always told her it would find the cause and take care of it. Bonnie was aware that L&L and TD2 did not agree with the Donan

report. Bonnie testified she was not concerned, because L&L and TD2 were working with her and Tabe to sort things out.

The de Vrieses, L&L, and TD2 met in September 2015 to discuss the matter, at which point L&L and TD2 proposed they conduct a more extensive investigation that would entail borings and a couple of surveys at different future dates to track movement. Bonnie testified that they agreed and that the surveys continued through April 2016.

Bonnie testified that she and Tabe understood the cause of the cracks could still be settlement and explained that she thought, "[O]kay, they are still trying to sort it out." According to Bonnie, nobody said, "'We're really worried about this.'" When Bonnie expressed concern to L&L about the progressing cracks, according to her testimony: "[I]t was usually, 'Look, we're trying to find the cause. We'll take care of it. But you have to find the cause to take care of it.' And so we did what they asked." Bonnie testified they were under the impression that L&L was going to discover what was happening and fix it.

(i) TD2 Report Dated November 19, 2015

TD2 took borings as discussed at the September 2015 meeting and as part of its testing and monitoring plan set forth in its August 18, 2015, report. In the first of two followup reports, dated November 19, 2015, TD2 concluded, based on soil samples from the borings, that the soil was not "swell susceptible"; therefore, "basement slab heave would be an unlikely cause for the distress."

According to TD2, it was "still early to speculate," but with the assumption that the slab was poured perfectly flat and level, "an interpretation would be consistent with perimeter settlement and not center heave." This "may also help explain why cracking in the drywall is not prevalent in the center of the house in ceilings and floors." The report suggested another "exterior monitoring" in 60 days and another interior floor levelness survey "at least 120 days out."

(j) Invoices Forwarded to the
de Vrieses on March 1, 2016

On March 1, 2016, TD2 forwarded its invoice for professional services from July 6 through October 4, 2015, consisting of a geotechnical consultation for a site visit and an interior soil sampling of the borings. It also forwarded its invoice for professional services from October 5, 2015, through May 29, 2016, consisting of a geotechnical consultation, an exterior survey, and an interior survey. The cover letter stated, "Enclosed is an invoice that was originally issued to [L&L] in October 2015. I found out today from [Lakeman] with [L&L] that the invoice should have been issued to you."

(k) TD2 Report Dated May 20, 2016

TD2 submitted its final report on May 20, 2016, following two additional rounds of monitoring at the exterior of the structure and one more round of monitoring in the basement floor level at the site. In the report, TD2 reiterated its conclusion that the soil was not "swell susceptible" and that therefore, the "basement slab heave would be an unlikely cause for the distress." The report provided further that, over the prior 6 months, "the total movements . . . generally do not show large or continuing movements"—although TD2 noted two points at the west end of the building on the concrete wall showing a differential of about an inch.

TD2 opined that "at least two different mechanisms are acting to cause the observable distress at the house." The first mechanism listed by TD2 in its report, exhibited at the rear patio, was "either the self-compression of the fill materials placed or the hydrocompaction of the supporting soils." The other distress to the house was caused by "a perimeter settlement of the foundations in the eastern portion of the house . . . due to infiltration of water to the bearing level causing softening and compression of the bearing soils."

TD2 articulated the caveat that its opinions were "what the data suggest at this time" and "[t]hat is not to say that my interpretation is the only possible explanation or that other

mechanisms may be acting alone or in conjunction as well." It stated additional monitoring once or twice a year "can be used to maintain a record of exterior and or relative interior movements over time if desired" to provide "assurance that continuing movements are or are not present."

### (l) 2016 Meetings and Other Discoveries

Bonnie testified that in all her discussions with Lakeman about the investigation of the cracking up through the summer of 2016, following TD2's final report on May 20, Lakeman had expressed that the problems were cosmetic, that L&L would continue to monitor the situation, and that "'we'll fix it, take care of it when we're finished.'" But, after TD2's May 2016 final report, "we said, well, wait a minute. Suddenly we have all these costly repairs when things have been minor, 'don't worry about it, we'll repair it.'"

L&L and TD2 met with the de Vrieses on May 20, 2016, and in July 2016. At the meetings, L&L and TD2 could not agree as to what should be done. At that point, the de Vrieses "proceeded to try and get more opinions, since . . . it was an extensive repair." Bonnie testified that it finally became apparent in May 2016, after TD2's final results were presented, that "there were major issues that were not going to be addressed or couldn't be addressed by the current people who were dealing with it."

According to Bonnie, it was not until the May 2016 meeting that the de Vrieses discovered TD2 had conducted an inspection of the lot in March 2011 for a different prospective builder and a different prospective client. Likewise, they did not receive a 2012 report by TD2 until May 2016. Bonnie testified it was also in May 2016 that she first noticed issues with the bluff. Chunks of it had fallen off, and such failure was getting closer to the lot line.

### (m) The de Vrieses' Investigations

On December 27, 2017, the de Vrieses entered into a contract with Terracon Consultants, Inc. (Terracon), to conduct a

forensic investigation concerning the house to determine potential causes of distress and remedial measures. The de Vrieses also hired King Kuebler Little, a structural engineer, to inspect the house and lot and recommend remedial measures. In April 2019, Little and Stephen Nickel, a civil, geotechnical engineer, worked together on a report setting forth the cause of the defects and recommendations for repairs.

Little and Nickel found a layer of crushed limestone containing free water beneath the soil fill, indicating the limestone had been used to provide a base for the backfill required by an overexcavation of the basement subgrade, which had not previously been revealed. The crushed limestone was a permeable zone that carried water to the glacial till, which swelled and brought on the heave seen in the basement floor slab. The report also found that it should have been clear the lot had a significant amount of overland surface water runoff requiring extra protective measures, including a deep interceptor drain, or French drain, along the east side, which drain was eventually installed in June 2017. The extra protective measures should have also included an interior, underfloor draintile.

### (n) Expert Testimony

Nickel was later retained by the de Vrieses as an expert witness. At trial, Nickel testified that while TD2's preconstruction reports contained good recommendations, they were not implemented by L&L. Nickel testified that L&L failed to install a subgrade in a good and workmanlike manner and that such failure made the lot unbuildable and caused damage to the house through movement in excess of the acceptable movement tolerances. That damage, Nickel explained, was likely to continue if not remedied.

Nickel described in detail the improper preparation of the subgrade for the foundation for the slab. This included finding limestone at the bottom rather than at the top of the fill soil directly beneath the floor slab. Limestone at the location where it was found acted to carry water to the glacial till soil, which is known to be able to swell in the proper conditions.

Further, the soil had not been moisture conditioned and the site had been dug to an unusually extensive depth.

Nickel testified that L&L failed to act in a workmanlike manner by failing, in the ways described, to properly prepare the subgrade, to install interior draintile along the foundation walls and laterally under the concrete slab, to specify a French draintile on the east side of the property as part of the drainage for the house, and to provide specification for the bluff.

Nickel explained that the bluff had moved into the lot and that without more permanent remedial measures beyond the emergency measures already undertaken by the de Vrieses, it would eventually detrimentally affect the house. Nickel explained that contractors had installed drainage systems as part of the necessary work Nickel recommended for emergency fixes for the failed bluff. As well, Nickel had recommended hydroseeding the bank and maintaining a tarp over it, which the de Vrieses undertook. These measures had significantly slowed down the toppling from the bluff, but failures were still occurring.

Nickel testified he had explored various permanent remedial measures and even the least expensive measure, per a contractor's bid, would cost $389,939, which Nickel considered fair and reasonable. Nickel testified without objection that the most expensive permanent remedial solution was $800,000 to $1 million. Because of cost, Nickel recommended the de Vrieses pursue the least expensive solution of $389,939.

Little was also eventually employed by the de Vrieses as an expert witness and testified at trial. Little explained it was customary for an engineer, in preparing specifications for a structure on a site, to consider both the lot and the surrounding areas, including slopes and bluffs near the site. Little agreed with Nickel that the "overwhelmingly significant mechanism" of the damage was heave and that L&L had failed to prepare the subgrade in a workmanlike manner. He opined that the manner in which L&L prepared the subgrade failed to make the lot buildable for a house. The resultant movement of the

house was outside of acceptable movement tolerances, and the resultant damage would likely continue if not remedied.

## (o) Diagnosis and Repair Expenses

Through both testimony and exhibits, the de Vrieses set forth evidence of the diagnosis and repair expenses relating to the defects of the house and the lot.

Bonnie testified that the de Vrieses incurred approximately $15,000 for Terracon's services. They also incurred approximately $6,700 to repair the geothermal that was damaged while extracting borings for the study. Bonnie also described approximately $10,000 in work conducted relating to the riverbank and another approximately $3,200 for borings. The de Vrieses also paid approximately $26,000 in repairs to the French drain and for the creation of a new drainage system and berm to stabilize the bank to some extent.

Exhibits entered into evidence without objection reflected approximately $397,000 as the total amount of both the estimates for repairs not yet carried out and invoices for work already done. As reflected in all exhibits, whether or not objected to, which were entered into evidence, but not including testimony, the total cost was approximately $420,000.

## 6. Motions for Directed Verdict

At the close of the de Vrieses' case, L&L moved for a directed verdict on the grounds of the statute of limitations, arguing that the visible cracks put the de Vrieses on notice of a defect at the latest by May 2015. Thus, they were not entitled to the statutory discovery period. L&L also stated with regard to its discovery argument, "[T]here's no pleading that says . . . there's a basis to toll that, which is required procedurally." L&L did not make any arguments specific to the issue of equitable estoppel. L&L also moved for a directed verdict on the de Vrieses' claim for damages related to the bluff, arguing that the allegations as to L&L's representations that the lot was buildable failed to present a recoverable basis under the contract and that there was insufficient evidence relating

to causation for that claim. The court overruled the motions for directed verdict, finding that the issues of the statute of limitations and the liability in relation to the bluff failure presented factual questions for the jury to decide. L&L renewed its motions for directed verdict at the close of all the evidence, which the court again overruled.

### 7. JURY INSTRUCTIONS

The matter was submitted to the jury. In instruction No. 2, it was stated that the de Vrieses paid L&L a total of $847,420.71 under the terms of the contract, the house was completed by March 2012, and the de Vrieses first observed some cracking in the house in May 2014.

Instruction No. 5 involved L&L's affirmative defense of the statute of limitations. It stated in full:

> Defendant affirmatively alleges that Plaintiffs' claims are barred because they were not timely filed within the applicable statute of limitations period. Before Defendant may prevail on this defense against Plaintiffs, Defendant must prove, by the greater weight of evidence that Plaintiffs' claims are barred by the Statute of Limitations, which provides as follows:

> Any action to recover damages based on any alleged breach of warranty on improvements to real property or based on any alleged deficiency in the design, planning, supervision, or observation of construction, or construction of an improvement to real property shall be commenced within four years after any alleged act or omission constituting such breach of warranty or deficiency. If such cause of action is not discovered and could not be reasonably discovered within such four-year period, or within one year preceding the expiration of such four-year period, then the cause of action may be commenced within two years from the date of such discovery or from the date of discovery of facts which would reasonably lead to such discovery, whichever is earlier. In no event may any action be commenced to recover damages for

an alleged breach of warranty on improvements to real property or deficiency in the design, planning, supervision, or observation of construction, or construction of an improvement to real property more than ten years beyond the time of the act giving rise to the cause of action.

Defects are discovered when a person of ordinary intelligence and prudence learns that defects exist[]. A person does not have to discover the exact nature or source of the defect, but only that a defect exists.

However, if you find that Defendant fraudulently, inequitably and/or lulled Plaintiffs into inaction, then you must disregard Defendant's defense of the statute of limitations.

Plaintiffs filed their action on February 15, 2017.

### EFFECT OF FINDINGS

If Defendant has not met its burden of proof on this issue then your verdict must be for Plaintiffs and you must indicate your decision on Verdict Form 2.

If on the other hand, you find that Defendant has met its burden of proof on this issue, then your Verdict must be for Defendant and you must indicate your decision on Verdict Form 2.

Instruction No. 4 stated that damages should be figured as follows: "If you find that the defects can be remedied without materially injuring or reconstructing a substantial portion of the property, then Plaintiffs are entitled to recover the reasonable cost of remedying the defects."

At the jury instruction conference, L&L had made the following objection to instruction No. 5: "The defendant objects and believes a date should be utilized." It did not raise any other omission. L&L then stated, "We also believe that the discovery period was not alleged in the amended complaint." L&L did not object to the specific language of instruction No. 5, stating that "[I]f you find the [D]efendant fraudulently, inequitably, and/or lulled Plaintiffs into inaction, then you must disregard Defendant's defense of the statute of limitations."

L&L did not object that estoppel had not been pled. There is no evidence contained in the record on appeal that L&L proposed any alternative jury instruction or that L&L requested special verdict forms to separate out the different defenses to the statute of limitations or to separate out what aspects of the de Vrieses' claims, which encompassed the house, the lot preparation, and the bluff, it found L&L liable for. L&L's stated objections to instruction No. 5 were overruled.

## 8. Jury Verdict

In verdict form No. 2, the jury found in favor of the de Vrieses on L&L's affirmative defense of the statute of limitations. On verdict form No. 1, the jury found in favor of the de Vrieses in their claims against L&L for breach of contract or breach of express warranties. In that form, the jury set forth damages in the amount of $418,175. The jury was not asked, through special verdict forms or otherwise, to separate liability relating to preparing the building site for the house to experience movement within standard tolerances from liability relating to the bluff failure. Likewise, the jury was not asked to separate the issue of the discovery period from the issue of equitable estoppel in determining whether the de Vrieses' action was barred by the statute of limitations.

## 9. Posttrial Motions

L&L filed a motion for judgment notwithstanding the verdict, pursuant to Neb. Rev. Stat. § 25-1315.02 (Reissue 2016), to alter or amend the judgment under Neb. Rev. Stat. § 25-1329 (Reissue 2016), and for new trial, pursuant to Neb. Rev. Stat. § 25-1142 (Reissue 2016). As pertinent to this appeal, the motion asserted the statute of limitations prohibited the de Vrieses' recovery and, in the alternative, the judgment should be set off by the amount of the de Vrieses' pretrial settlement with TD2 and should be further limited to the cost of repairs in the amount of $289,845. The motion did not specifically ask for a new trial on the basis of excessive damages or because of prejudicial jury instructions, and it did not

specifically assert that the issue of estoppel should not have been submitted to the jury because it was not pleaded.

### (a) Statute of Limitations

At the hearing on the motion, L&L asserted, first, that the undisputed facts established the statute of limitations set forth in Neb. Rev. Stat. § 25-223 (Reissue 2016) prohibited the de Vrieses' recovery. Specifically, L&L argued that the June 2015 Donan report put the de Vrieses on notice of their claim 5 months before the 3-year discovery period, such that the de Vrieses were not entitled to the statutory 2-year tolling period.

L&L also reiterated its objection regarding instruction No. 5 and the absence therein of "a date . . . as to when that discovery should have taken place by."

Finally, for the first time since its motion for summary judgment, L&L specifically raised at the hearing the fact that estoppel was not pled in the de Vrieses' complaint. L&L argued the jury thus should not have been instructed on that theory. The de Vrieses responded that the issue had been tried by implicit consent, when L&L failed to object to testimony on that issue, and that the de Vrieses had offered to amend their complaint around the time of the jury instruction conference.

The court denied this aspect of the motion, reiterating its reasoning set forth in its order denying L&L's motion for summary judgment and summarizing it was for the jury to decide when the de Vrieses reasonably should have discovered L&L's breach. The court noted that the jury heard evidence of the Donan report and were presumed to have taken it into consideration. In its written order, the court stated as to the equitable estoppel defense, "this was not formally pled by Plaintiffs and therefore the jury was never instructed on equitable estoppel and the Court will not further address this issue."

### (b) Settlement Setoff

Second, L&L asked at the hearing that the jury verdict and judgment be reduced and amended so as to set off the

amount of the de Vrieses' pretrial settlement with TD2. L&L asserted that there was a single injury to the house and that the de Vrieses received compensation in the settlement with TD2 for that single injury. L&L did not introduce the settlement agreement into evidence or move to compel its production.

The court denied the request for setoff. The court noted that it did not know the amount of the settlement. Further, there was no evidence as to what claims the settlement encompassed. The de Vrieses had sought to recover against TD2 not only damages as to the residence, but also for the bluff. And they sought against TD2 the recovery of stigma damages related to the house, which the de Vrieses were not permitted to recover against L&L. Thus, concluded the court, "it would not be possible to determine what amount of the settlement proceeds from TD2 related to what alleged damage."

(c) Unrecoverable Costs

In the alternative to its motions based on the statute of limitations and in addition to its alternative motion for setoff, L&L asked that the jury verdict and judgment be limited to the cost of repairs in an amount no more than $289,845. In making this argument, L&L relied on exhibit 271, offered into evidence by the de Vrieses and entered into evidence without objection. Exhibit 271 contained a bid by Carlson Projects, Inc., for the repair of various aspects of the house. The total estimate to complete that work was $289,845. One of the owners of Carlson Projects testified at trial that he did not determine what repairs were necessary, but relied on the recommendations made by Little.

L&L claimed that any other evidence of costs were unrecoverable litigation costs or were costs related to the drainage of the bluff. It believed, given the amount of damages, that the jury had implicitly found it was not liable for the bluff or drainage issues of the lot. Therefore, argued L&L, the amount of the damages the jury awarded was excessive.

The court rejected L&L's premise that the only evidence at trial relating to the costs of repair was the Carlson Projects

estimate in the amount of $289,845. The court stated there was also evidence of repairs made by the de Vrieses separate from the Carlson Projects estimate, including installation of the drainage system and water diversion project, along with the engineering costs associated therewith.

### 10. Motion to Reconsider and to Produce Settlement Agreement

After the court denied L&L's multifaceted postjudgment motion, L&L filed a motion to reconsider, require production, and supplement the record on its posttrial motions. L&L asked the court for an order requiring the de Vrieses to "immediately produce the Confidential Settlement Agreement to the Court and counsel for L&L." After the de Vrieses produced the settlement agreement, L&L asked that the court supplement the record and admit the settlement into evidence as exhibit 472 under seal. L&L requested that the court then review the settlement agreement and reconsider its order denying L&L's prior motion to reduce and amend the jury verdict in light thereof.

The court denied the motion to produce and reconsider. It noted that L&L did not object to the dismissal of TD2 due to its settlement with the de Vrieses and that at no point before L&L's latest motion had it pursued production of the settlement agreement. The court stated that L&L had the opportunity at the hearings on its prior motions to make a record and request production of the settlement agreement, but L&L failed to do so. In any case, reasoned the court, production of the settlement agreement would not resolve the issues already noted in the court's order denying L&L's motion to reduce and amend the jury verdict.

## III. ASSIGNMENTS OF ERROR

L&L assigns that the district court erred in (1) entering judgment against it in the amount of $418,175, (2) determining the de Vrieses were not barred from recovery as a result of the statute of limitations set forth in § 25-223, (3) denying L&L's

posttrial motions, (4) refusing to set off the judgment by the amount of the settlement agreement between the de Vrieses and TD2, (5) denying L&L's motion to reconsider and refusing to require the de Vrieses to accept into evidence the settlement agreement between the de Vrieses and TD2, (6) determining that the judgment amount was not excessive and did not include nonrecoverable costs, and (7) giving its instructions to the jury on L&L's statute of limitations defense.

On cross-appeal, the de Vrieses assign that the district court erred in (1) excluding the de Vrieses' expert witness testimony, exhibit evidence, and argument, which would have supported causation and damages relating to the stigma remaining on the de Vrieses' property after repairs are completed, and (2) preventing the de Vrieses from submitting the issue of stigma damages to the jury.

## IV. STANDARD OF REVIEW

[1] When reviewing a jury verdict, the appellate court considers the evidence and resolves evidentiary conflicts in favor of the successful party.[1]

[2] A jury verdict may not be set aside unless clearly wrong, and it is sufficient if there is competent evidence presented to the jury upon which it could find for the successful party.[2]

[3] When the jury returns a general verdict for one party, we presume that the jury found for the successful party on all issues raised by that party and presented to the jury.[3]

[4] The "general verdict" rule, which is also referred to as the "two issue" rule, is a policy rule which provides that where a general verdict is returned for one of the parties, and the mental processes of the jury are not tested by special

---

[1] *Jacobs Engr. Group v. ConAgra Foods*, 301 Neb. 38, 917 N.W.2d 435 (2018).

[2] *ACI Worldwide Corp. v. Baldwin Hackett & Meeks*, 296 Neb. 818, 896 N.W.2d 156 (2017)

[3] *Golnick v. Callender*, 290 Neb. 395, 860 N.W.2d 180 (2015).

interrogatories to indicate which issue was determinative of the verdict, it will be presumed that all issues were resolved in favor of the prevailing party, and, where a single determinative issue has been presented to the jury free from error, any error in presenting another issue will be disregarded.[4]

[5] One cannot silently tolerate error, gamble on a favorable result, and then complain that one guessed wrong.[5]

[6] An appellate court will not consider an issue on appeal that was not presented to or passed upon by the trial court.[6]

[7] A motion for reconsideration, which is considered nothing more than an invitation to the court to consider exercising its inherent power to vacate or modify its own judgment, is insufficient for purposes of asking a trial court to pass upon an issue in order to properly preserve it for appeal.[7]

[8] The point at which a statute of limitations begins to run must be determined from the facts of each case, and the decision of the district court on the issue of the statute of limitations normally will not be set aside by an appellate court unless clearly wrong.[8]

[9] In reviewing a trial court's ruling on a motion for directed verdict, an appellate court must treat the motion as an admission of the truth of all competent evidence submitted on behalf of the party against whom the motion is directed; such being the case, the party against whom the motion is directed is entitled to have every controverted fact resolved in its favor and to have the benefit of every inference which can reasonably be deduced from the evidence.[9]

---

[4] *Kuhnel v. BNSF Railway Co.*, 20 Neb. App. 884, 834 N.W.2d 803 (2013), *reversed on other grounds*, 287 Neb. 541, 844 N.W.2d 251 (2014); *Lahm v. Burlington Northern RR. Co.*, 6 Neb. App. 182, 571 N.W.2d 126 (1997).

[5] *Maxwell v. Montey*, 262 Neb. 160, 631 N.W.2d 455 (2001).

[6] *Id.*

[7] See *id.*

[8] *Manker v. Manker*, 263 Neb. 944, 644 N.W.2d 522 (2002).

[9] *Jacobs Engr. Group v. ConAgra Foods, supra* note 1.

[10] Review of a ruling on a motion for judgment notwithstanding the verdict is de novo on the record.[10]

[11] Whether a jury instruction is correct is a question of law, which an appellate court independently decides.[11]

[12] Failure to object to jury instructions after they have been submitted to counsel for review or to offer more specific instructions if counsel feels the court-tendered instructions are not sufficiently specific precludes raising an objection on appeal.[12]

[13] Jury instructions are subject to the harmless error rule, and an erroneous jury instruction requires reversal only if the error adversely affects the substantial rights of the complaining party.[13]

[14] In an appeal based on a claim of an erroneous jury instruction, the appellant has the burden to show that the questioned instruction was prejudicial or otherwise adversely affected a substantial right of the appellant.[14]

[15] Where jury instructions are claimed deficient on appeal and such issue was not raised at trial, an appellate court reviews for plain error.[15]

[16] An appellate court reviews a denial of a motion to alter or amend the judgment for an abuse of discretion.[16]

[17] On appeal, the fact finder's determination of damages is given great deference.[17] The amount of damages to be awarded is a determination solely for the fact finder, and its action in

---

[10] *Valley Boys v. American Family Ins. Co.*, 306 Neb. 928, 947 N.W.2d 856 (2020).

[11] *City of Wahoo v. NIFCO Mech. Systems*, 306 Neb. 203, 944 N.W.2d 757 (2020).

[12] See *Wilkins v. Bergstrom*, 17 Neb. App. 615, 767 N.W.2d 136 (2009); Neb. Ct. R. § 6-802.

[13] *Haffke v. Signal 88*, 306 Neb. 625, 947 N.W.2d 103 (2020).

[14] *Shipler v. General Motors Corp.*, 271 Neb. 194, 710 N.W.2d 807 (2006).

[15] *Foundation One Bank v. Svoboda*, 303 Neb. 624, 931 N.W.2d 431 (2019).

[16] *Jacobs Engr. Group v. ConAgra Foods, supra* note 1.

[17] *Shipler v. General Motors Corp., supra* note 14.

this respect will not be disturbed on appeal if it is supported by evidence and bears a reasonable relationship to elements of damages proved.[18]

[18] While the amount of damages presents a question of fact, the proper measure of damages presents a question of law.[19]

[19] An award of damages may be set aside as excessive or inadequate when, and not unless, it is so excessive or inadequate as to be the result of passion, prejudice, mistake, or some other means not apparent in the record.[20]

[20] Allocation of a settlement agreement is reviewed for an abuse of discretion.[21]

## V. ANALYSIS

In its appeal, L&L asserts that the de Vrieses' action was barred by the statute of limitations as a matter of law and the district court erred in finding otherwise. In the event we uphold the jury's determination that the de Vrieses' claims were not barred as a matter of law by the statute of limitations, L&L contends we should find that the court erred in its jury instruction on the statute of limitations. In the event we disagree with L&L's assertion that a new trial was warranted because the jury instruction on the statute of limitations was prejudicial, L&L asks that we find merit to its arguments that the court erred in refusing to reduce the amount of the damages awarded by the jury. The de Vrieses' cross-appeal challenges the court's exclusion of evidence pertaining to stigma damages.

### 1. Statute of Limitations

We first consider L&L's arguments pertaining to the statute of limitations. In a verdict form on the statute of limitations,

---

[18] *U.S. Pipeline v. Northern Natural Gas Co.*, 303 Neb. 444, 930 N.W.2d 460 (2019).

[19] *Connelly v. City of Omaha*, 284 Neb. 131, 816 N.W.2d 742 (2012).

[20] *Roth v. Wiese*, 271 Neb. 750, 716 N.W.2d 419 (2006).

[21] *Strasburg v. Union Pacific RR. Co.*, 286 Neb. 743, 839 N.W.2d 273 (2013).

the jury rendered a verdict in favor of the de Vrieses, after being instructed on both tolling and estoppel. We cannot explain the district court's statement in its order denying the posttrial motions that the jury was not instructed on estoppel. The record shows otherwise, and L&L's arguments on appeal acknowledge this fact. Instruction No. 5 instructed the jury on estoppel by stating, after a description of the discovery period: "However, if you find that Defendant fraudulently, inequitably and/or lulled Plaintiffs into inaction, then you must disregard Defendant's defense of the statute of limitations."

L&L contends reasonable minds could only have drawn the conclusion that the de Vrieses should have discovered their cause of action such that they were not protected by the discovery period of the statute. L&L does not similarly argue reasonable minds could not differ as to whether L&L was estopped from asserting § 25-223(1) as a defense; instead, L&L asserts the question of estoppel should have been disposed of as a matter of law because the de Vrieses failed to plead it. Alternatively to these arguments that it was entitled to judgment as a matter of law, L&L asserts that it was prejudiced by the jury instruction on the statute of limitations and that the court should have granted its motion for a new trial.

The parties agree that the de Vrieses' action was governed by the statute of limitations in § 25-223:

Any action to recover damages based on any alleged breach of warranty on improvements to real property or based on any alleged deficiency in the design, planning, supervision, or observation of construction, or construction of an improvement to real property shall be commenced within four years after any alleged act or omission constituting such breach of warranty or deficiency. *If such cause of action is not discovered and could not be reasonably discovered within such four-year period, or within one year preceding the expiration of such four-year period, then the cause of action may be commenced within two years from the date of such discovery or*

*from the date of discovery of facts which would reason-
ably lead to such discovery, whichever is earlier.* In no
event may any action be commenced to recover damages
for an alleged breach of warranty on improvements to real
property or deficiency in the design, planning, supervi-
sion, or observation of construction, or construction of an
improvement to real property more than ten years beyond
the time of the act giving rise to the cause of action.

(Emphasis supplied.)

[21] Where the basis of the claim is improper workmanship
resulting in defective construction, under either negligence
or breach of the implied warranty to perform in a workman-
like manner,[22] the statute of limitations of § 25-223 runs from
the date of substantial completion of the project, not the date
of any specific act which resulted in the defect.[23] The parties
agree that the home was substantially completed by November
2012. The de Vrieses' action was not brought until February
15, 2017.

[22,23] Aside from discovery periods set forth by statute,
we have recognized equitable estoppel may be successfully
asserted to avoid the statute of limitations defense when one
lulls his or her adversary into a false sense of security, thereby
causing that person to subject his or her claim to the bar of the
statute of limitations, and then pleads the very delay caused
by his or her conduct as a defense to the action when it is
filed.[24] Used in this way, estoppel does not extend the statute
of limitations but prevents a party from pleading and utilizing

---

[22] See, *McCaulley v. C L Enters.*, 309 Neb. 141, 959 N.W.2d 225 (2021);
*Murphy v. Spelts-Schultz Lumber Co.*, 240 Neb. 275, 481 N.W.2d 422
(1992); *Williams v. Kingery Constr. Co.*, 225 Neb. 235, 404 N.W.2d 32
(1987).

[23] See, *McCaulley v. C L Enters., supra* note 22; *Adams v. Manchester Park*,
291 Neb. 978, 871 N.W.2d 215 (2015). See, also, *Fuelberth v. Heartland
Heating & Air Conditioning*, 307 Neb. 1002, 951 N.W.2d 758 (2020);
*Witherspoon v. Sides Constr. Co.*, 219 Neb. 117, 362 N.W.2d 35 (1985).

[24] See *Rauscher v. City of Lincoln*, 269 Neb. 267, 691 N.W.2d 844 (2005).

the statute as a bar—although a potential plaintiff must still act diligently to file the action within a reasonable time.[25]

### (a) Statute of Limitations as Matter of Law

[24] With respect to its challenges to the jury's verdict on the statute of limitations as a matter of law, L&L raises the denial of its motions for summary judgment, directed verdict, and judgment notwithstanding the verdict. The denial of a motion for summary judgment is neither appealable nor reviewable.[26] A directed verdict is proper at the close of all the evidence only when reasonable minds cannot differ and can draw but one conclusion from the evidence, that is, when an issue should be decided as a matter of law.[27] A motion for judgment notwithstanding the verdict may be granted when the movant's previous motion for directed verdict, made at the conclusion of all the evidence, should have been sustained.[28]

In considering whether the court erred in denying judgment as a matter of law based on the statute of limitations, either a finding of protection under the discovery period of § 25-223 or that L&L was estopped from relying on § 25-223 would be determinative of whether the de Vrieses' action was time barred. Stated another way, for L&L to be entitled to judgment as a matter of law on the statute of limitations, it must have been determinable as a matter of law both that (1) the action was not brought within the discovery period of § 25-223 and (2) L&L was not estopped from relying on the statute of limitations; a factual dispute as to either question would prevent

---

[25] See, *Reifschneider v. Nebraska Methodist Hosp.*, 233 Neb. 695, 447 N.W.2d 622 (1989); 54 C.J.S., *Limitations of Actions* § 56 (2020).

[26] See *Doe v. Zedek*, 255 Neb. 963, 587 N.W.2d 885 (1999). See, also, e.g., *State ex rel. Peterson v. Creative Comm. Promotions*, 302 Neb. 606, 924 N.W.2d 664 (2019).

[27] *AVG Partners I v. Genesis Health Clubs*, 307 Neb. 47, 948 N.W.2d 212 (2020).

[28] *Facilities Cost Mgmt. Group v. Otoe Cty. Sch. Dist.*, 298 Neb. 777, 906 N.W.2d 1 (2018).

judgment as a matter of law that the de Vrieses' action was barred by the statute of limitations. And as we explain, the district court did not err when it failed to determine as a matter of law that the de Vrieses could not rely on estoppel to avoid L&L's statute of limitations defense.

L&L argues the district court should have determined the de Vrieses could not rely on estoppel to avoid L&L's statute of limitations defense because estoppel was "a defense . . . that had not been pled."[29] As support for the contention that estoppel must be formally pled before a plaintiff can rely on the doctrine to avoid a statute of limitations defense, L&L relies on the Nebraska Court of Appeals opinion in *Gard v. City of Omaha*.[30] As we explain, L&L reads *Gard* too broadly.

In *Gard*, the Court of Appeals recited the general principle that estoppel is an affirmative defense which must be raised in the pleadings,[31] and it then suggested the same rule should apply when estoppel is asserted "in avoidance of the statute of limitations rather than as an affirmative defense."[32] But *Gard* also cited to settled case law from this court holding that a "party entitled to estoppel need not in all cases formally plead estoppel [and] if facts constituting estoppel are in any way sufficiently pleaded, party is entitled to benefit of law arising therefrom."[33] After reciting these principles, the Court of Appeals in *Gard* reasoned that even if the plaintiffs had sufficiently pled facts constituting estoppel, the evidence did not support the doctrine because there was no evidence that the

---

[29] Brief of appellant at 28.

[30] *Gard v. City of Omaha*, 18 Neb. App. 504, 786 N.W.2d 688 (2010).

[31] See, generally, Neb. Ct. R. Pldg. § 6-1108(c) (including estoppel among nonexclusive list of affirmative defenses which must be set forth affirmatively in responsive pleading).

[32] *Gard, supra* note 30, 18 Neb. App. at 511, 786 N.W.2d at 695.

[33] *Id.*, citing *Greer v. Chelewski*, 162 Neb. 450, 76 N.W.2d 438 (1956). Accord *U. S. Tire Dealers Mutual Corporation v. Laune*, 139 Neb. 26, 296 N.W. 333 (1941).

defendant lulled the plaintiffs into a false sense of security that caused plaintiffs to delay in filing their claim. Contrary to L&L's assertion, *Gard* did not announce a new rule that plaintiffs must formally plead estoppel before they can raise the doctrine in response to a defendant's affirmative defense.

[25] Instead, it remains the rule in Nebraska that when estoppel is raised as an affirmative defense to a claim for relief, it must be affirmatively set forth in the party's responsive pleading.[34] But when a plaintiff raises estoppel to avoid or rebut an affirmative defense that has been alleged in a responsive pleading, evidence of estoppel is generally admissible without being formally pled.[35]

These differing pleading requirements are consistent with Nebraska's pleading rules, which no longer require a reply to an answer unless ordered by the court[36] and which provide instead that "[a]verments in a pleading to which no responsive pleading is required or permitted shall be taken as denied or avoided."[37] Nevertheless, we encourage courts to utilize the pretrial conference to identify the issues to be tried and to set out those issues in a pretrial order, which can cure any question of whether a defense was raised.[38]

On this record, there is no merit to L&L's contention that the de Vrieses were required to formally plead estoppel in avoidance of the affirmative defense raised by L&L. The district court did not err in failing to determine as a matter of law that the de Vrieses could not rely on estoppel to avoid L&L's statute of limitations defense.

---

[34] See Neb. Ct. R. Pldg. § 6-1108(c).

[35] See *Greer,* supra note 33. Accord, *Fluckey v. Anderson*, 132 Neb. 664, 669, 273 N.W. 41, 43 (1937) ("'[e]vidence of estoppel is admissible without being pleaded in order to rebut evidence introduced by the opposite party'").

[36] See Neb. Ct. R. Pldg. § 6-1107(a).

[37] Neb. Ct. R. Pldg. § 6-1108(d).

[38] See *Jill B. & Travis B. v. State*, 297 Neb. 57, 899 N.W.2d 241 (2017).

(b) Jury Instructions on Statute of Limitations

[26-29] We turn to L&L's alternative argument that it was prejudiced by the jury instruction on the statute of limitations such that the district court should have granted its motion for a new trial. In doing so, we apply the following general principles. Directly quoting an applicable statute is a permissible form of jury instruction.[39] And where a general charge fairly presents the case to the jury, it is not error for the trial court, in the absence of a request for a more specific instruction, to fail to give a more elaborate one.[40] To establish reversible error from a court's failure to give a requested jury instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction was warranted by the evidence, and (3) the appellant was prejudiced by the court's failure to give the requested instruction.[41] If the instructions given, which are taken as a whole, correctly state the law, are not misleading, and adequately cover the issues submissible to a jury, there is no prejudicial error concerning the instructions and necessitating a reversal.[42] Failure to object to jury instructions after they have been submitted to counsel for review or to offer more specific instructions if counsel feels the court-tendered instructions are not sufficiently specific, precludes raising an objection on appeal.[43]

We find that the general verdict rule applies to L&L's challenge to the jury instruction on the statute of limitations. Any error in the jury instruction on the discovery period will be disregarded if the instruction on estoppel was presented to the jury free from error, and vice versa. When the jury returns a general verdict for one party, we presume that the jury

---

[39] See *State v. Reichstein*, 233 Neb. 715, 447 N.W.2d 635 (1989).

[40] *Smith v. Wrehe*, 199 Neb. 753, 261 N.W.2d 620 (1978).

[41] *VKGS v. Planet Bingo*, 309 Neb. 950, 962 N.W.2d 909 (2021).

[42] *Id.*

[43] *Wilkins v. Bergstrom, supra* note 12. See Neb. Ct. R. § 6-802.

found for the successful party on all issues raised by that party and presented to the jury.[44] Under the "general verdict" rule, where a general verdict is returned for one of the parties, and the mental processes of the jury are not tested by special interrogatories to indicate which issue was determinative of the verdict, it will be presumed that all issues were resolved in favor of the prevailing party, and, where a single determinative issue has been presented to the jury free from error, any error in presenting another issue will be disregarded.[45] While the jury was presented with a special verdict form on the statute of limitations, that form did not separate the issue of the discovery period from the issue of equitable estoppel. We must therefore presume the jury found in favor of the de Vrieses on both issues, either of which would independently support its finding that the de Vrieses' action was not barred by the statute of limitations.

Nevertheless, we will briefly address both arguments challenging the instruction on the statute of limitations. We find neither has merit.

L&L's first argument is that it was prejudicial error for the court to refuse to instruct the jury on the dates the discovery period began to run and on the relevant dates defining the period of discovery. L&L's only objection to the district court's refusal, pertaining to the current argument based on the failure to specify dates, was as follows: "The defendant objects and believes a date should be utilized." The record fails to reflect that L&L elaborated at the jury instruction conference upon what that date should be. There is no evidence in the record that L&L tendered any alternative jury instruction. L&L's vague objection that the instruction should include "a date" failed to preserve the alleged error that the instruction was

---

[44] *Rodriguez v. Surgical Assocs.*, 298 Neb. 573, 905 N.W.2d 247 (2018).

[45] *Lahm v. Burlington Northern RR. Co., supra* note 4. See, also, *First Nat. Bank North Platte v. Cardenas*, 299 Neb. 497, 909 N.W.2d 79 (2018); *Lewison v. Renner*, 298 Neb. 654, 905 N.W.2d 540 (2018); *Golnick v. Callender, supra* note 3.

insufficiently specific. And the general charge on the discovery period correctly stated the law, was not misleading, and adequately covered the issues submissible to a jury.

[30,31] L&L's second assertion is that it was prejudicial error to instruct the jury on estoppel because it was not pleaded. We have already determined this argument lacks merit. We also observe that L&L did not object below to the instruction on estoppel. Instead, L&L stated, "We also believe that the discovery period was not alleged in the amended complaint." Discovery periods and equitable estoppel involve two different doctrines.[46] Equitable estoppel is not based upon the construction of a statute of limitations, but on the common law.[47] Further, when a reasonable person should have discovered with due diligence a cause of action for purposes of a statutory discovery period requires no fault on the part of the defendant.[48] Equitable estoppel, in contrast, requires fault on the part of the defendant.[49] Stated another way, discovery periods focus on the plaintiff's knowledge, whereas equitable estoppel focuses on the defendant's conduct.

We make no comment on the adequacy of the wording of the estoppel instruction used here, as that has not been raised on appeal. We disagree with L&L's contention that the district court erred in its instruction on the statute of limitations such that L&L is entitled to a new trial.

## 2. No Settlement Setoff

The remaining issues raised by L&L on appeal concern damages. L&L's first argument in this regard is that the district court erred when it failed to set off from the jury verdict

---

[46] See, e.g., *Reifschneider v. Nebraska Methodist Hosp., supra* note 25; *Muller v. Thaut*, 230 Neb. 244, 430 N.W.2d 884 (1988).

[47] See, *Muller v. Thaut, supra* note 46. See, also, *In re Estate of Fuchs*, 297 Neb. 667, 900 N.W.2d 896 (2017).

[48] See *In re Estate of Fuchs, supra* note 47.

[49] See *id.*

the amount of the de Vrieses' settlement with TD2 and that it erred in denying L&L's motions, after the court's ruling denying setoff, to compel and reconsider.

L&L sought a pro tanto setoff relying on the general proposition that where several claims are asserted against several parties for redress of the same injury, only one satisfaction can be had.[50] Under this principle, the defendant is not entitled to a setoff to the extent settlement is reached for an injury or damages the remaining defendant or defendants in the action are not found liable.[51] We do not understand L&L to have asserted a right to a setoff under any other legal theory, and we limit our analysis accordingly.

[32] The party who pleads a setoff bears the burden of proving it.[52] Typically, at the hearing on the motion, the movant for a setoff introduces into evidence the settlement at issue.[53] While the settlement with the dismissed party may be in the hands of the plaintiff, the plaintiff is not required to volunteer it at the hearing on the defendant's motion; instead, the defendant has the burden to request its production.

L&L did not present the court with evidence of the settlement between TD2 and did not request its production at the hearing on the motion for setoff. While L&L argues its hands were tied because of the court's pretrial order prohibiting L&L from presenting to the jury the fact that TD2 was initially a defendant to the action, L&L does not specifically assign that order as error. Moreover, that order restricted presentation of evidence to the jury. It did not prevent L&L from seeking production of the settlement agreement and introducing it for the court's consideration at the bench hearing on its motion for setoff.

---

[50] See, *Jameson v. Liquid Controls Corp.*, 260 Neb. 489, 618 N.W.2d 637 (2000); *Vowers & Sons, Inc. v. Strasheim*, 254 Neb. 506, 576 N.W.2d 817 (1998).

[51] See *id.* See, also, *Strasburg v. Union Pacific RR. Co., supra* note 21.

[52] *Davis Erection Co. v. Jorgensen*, 248 Neb. 297, 534 N.W.2d 746 (1995).

[53] See, e.g., *Strasburg v. Union Pacific RR. Co., supra* note 21.

In denying the motion for setoff, the court reasoned that, as a result of the settlement agreement not being produced, it did not know the amount of the settlement or what claims or damages the settlement encompassed. The court explained that the de Vrieses had sought to recover against TD2 not only damages as to the residence, but also for the bluff, and further, that the de Vrieses had sought to recover stigma damages related to the house, which they were not allowed to recover from L&L. Thus, concluded the court, "it would not be possible to determine what amount of the settlement proceeds from TD2 related to what alleged damage." We agree that the court could not determine the extent to which the settlement compensated the de Vrieses for the same injury and damage, if at all. The district court did not abuse its discretion in denying the motion for setoff.

We review the denial of a motion to reconsider for an abuse of discretion. A court's order on a motion to compel is likewise reviewed for an abuse of discretion.[54] As the district court pointed out, L&L's motion to compel, following the court's ruling on the motion for setoff, was untimely. A motion for reconsideration, which is considered nothing more than an invitation to the court to consider exercising its inherent power to vacate or modify its own judgment, is insufficient for purposes of asking a trial court to pass upon an issue in order to properly preserve it for appeal.[55] We find no abuse of discretion in the court's decision to overrule the motion to compel as untimely and in denying L&L's motion to reconsider the court's ruling on the motion for setoff.

3. EXCESSIVE DAMAGES BEYOND COSTS TO REPAIR

L&L's remaining challenge to the amount of the damages concerns the court's denial of what was, in essence, a motion for remittitur, made as part of L&L's motion to alter or amend.

---

[54] See *Thynne v. City of Omaha*, 217 Neb. 654, 351 N.W.2d 54 (1984).

[55] See *Maxwell v. Montey, supra* note 5.

L&L asserts that the jury awarded a sum that exceeded the amount proved by competent evidence. An appellate court reviews a denial of a motion to alter or amend the judgment for an abuse of discretion.[56]

[33-35] The amount of damages to be awarded is a determination solely for the fact finder, and the fact finder's decision will not be disturbed on appeal if it is supported by the evidence and bears a reasonable relationship to the elements of the damages proved as opposed to uncertain, speculative recovery.[57] Where a verdict is excessive, but not so much as to indicate passion or prejudice on the part of the jury, the error may be corrected by remittitur, if the excess can be estimated with reasonable certainty.[58] An appellate court should order remittitur only when the award is contrary to all reason.[59] And if there is no method by which a court can rationally ascertain the extent of the excess of a verdict, a remittitur cannot be required, for the reason that under such circumstances, a remittitur is nothing more than a substitution of the judgment of the court for that of the fact finder.[60]

L&L calculates that the damages award should have been reduced to $289,845, a sum derived from a contractor's estimate to make the repairs to the house that were recommended by the geotechnical engineers hired by the de Vrieses to determine the necessary course of action to remedy the defects. L&L asserts the jury, in awarding $418,175, must have relied on amounts attributable to the work of geotechnical engineers who were later secured by the de Vrieses as expert witnesses. And L&L asserts that all of the work of the geotechnical engineers, who later testified at trial on the de Vrieses' behalf, constituted nonrecoverable litigation costs. While indisputably

---

[56] *Jacobs Engr. Group v. ConAgra Foods, supra* note 1.

[57] See, *id.*; *Roth v. Wiese, supra* note 20.

[58] *Jacobs Engr. Group v. ConAgra Foods, supra* note 1.

[59] *Id.*

[60] *Nelson-Holst v. Iverson*, 239 Neb. 911, 479 N.W.2d 759 (1992).

there was ample other evidence concerning the costs to cure the failing bluff and to provide proper drainage of the lot, supporting the amount of the damages awarded, L&L urges our court to discount this evidence based on L&L's conjecture that the jury found it was not liable for the bluff or the lot. L&L surmises the jury found it liable only for damages to the house itself.

[36] We find no error in the court's denial of L&L's motion for remittitur. Much of the testimony and exhibits supporting the amount of the jury's award was not objected to, and the court did not err in overruling L&L's objections to investigation costs associated with identifying the sources of the problems with the house and how to fix them. Amounts expended to investigate the extent of a defect and determine the proper course of remediation are recoverable damages, not litigation costs.[61] We decline L&L's invitation to speculate, based on the amount of the award, that the jury reasoned L&L was not liable for any remedial measures or repair costs concerning the bluff or lot drainage. Our mandate in light of the general liability verdict form presented to the jury is to presume the jury found for the de Vrieses on all issues raised and presented to the jury.[62] To do otherwise would be to improperly speculate as to the jury's deliberation.[63] There are no grounds presented in this appeal justifying reversal of the jury's award of damages.

## 4. Cross-Appeal

Having found no merit to L&L's appeal, we turn to the de Vrieses' cross-appeal. The de Vrieses assert that the district court erred in excluding expert testimony on stigma damages and preventing them from submitting the issue of stigma damages to the jury with respect to damages for the defective construction of the house.

---

[61] See *Stearman v. Centex Homes*, 78 Cal. App. 4th 611, 92 Cal. Rptr. 2d 761 (2000).

[62] See *Golnick v. Callender, supra* note 3.

[63] See *VKGS v. Planet Bingo, supra* note 41.

[37,38] Under Neb. Rev. Stat. § 25-1146 (Reissue 2016), "[w]henever damages are recoverable, the plaintiff may claim and recover any rate of damages to which he may be entitled for the cause of action established." In connection with damages for a breach of warranty concerning building construction or injury to a building or other structure, we have noted with approval the general principle that the "'basic goal of the court is compensation—that is, to award such an amount of money as will restore the injured party to the same property status which he occupied immediately prior to the injury.'"[64] Further, because "'[t]he facts vary from case to case,'"[65] "'[a] rule of damages which produces compensation in one case may be overcompensation (or undercompensation) in another case.'"[66]

[39] In *"L" Investments, Ltd. v. Lynch*,[67] we said that the proper measure of damages for injury to an improvement upon real estate that can be repaired is, in addition to any other consequential damages the injured party may establish by proper proof, the reasonable cost of repairing the property in like kind and quality if: (1) the improvement upon realty is damaged without damage to the realty itself, (2) the nature of the thing damaged is such that it is capable of being repaired or restored, (3) the cost of doing so is capable of reasonable ascertainment, and (4) the cost of repair or restoration does not exceed the market value of the property just before the injury. On this last factor, we elaborated that "one ought not to be able to recover a greater amount for partial destruction than one could recover for total destruction"; thus, "[i]f, in fact, the cost of repair or restoration exceeds the market value of the property just before the injury, then the proper measure

---

[64] *"L" Investments, Ltd. v. Lynch*, 212 Neb. 319, 323-24, 322 N.W.2d 651, 654 (1982), quoting 22 Am. Jur. 2d *Damages* § 138 (1965).

[65] *Id.* at 324, 322 N.W.2d at 654.

[66] *Id.* at 324, 322 N.W.2d at 654-55.

[67] *"L" Investments, Ltd. v. Lynch, supra* note 64.

of damages is the market value of the property just before the damages were incurred, less any salvage."[68]

But we specifically rejected in *"L" Investments, Ltd.*, any rule that would limit damages for the costs of repairs to those that do not exceed the diminution of value of property, disapproving of prior law stating otherwise. We explained that, for example, when someone damages some windows of an old warehouse, it may suffer no diminished value in relation to its total value and it may still be capable of fulfilling its intended function; nevertheless, the owner is entitled to demand that the wrongdoer repair the broken windows.[69] The owner is entitled to have the building without broken windows even though the total value of the property remains unchanged.[70]

In *Jones v. Elliott*,[71] another case involving real property, we explained that there is no conflict between the rule that the damage to which the owner is entitled to recover is the expense of making the work conform to contractual requirements and the rule that if the defects cannot be remedied without reconstruction of or material injury to a substantial portion of the building, the measure of damages is the difference between its value when constructed and what its value would have been if built according to contract. "'Each rule is enforceable under any state of facts to which it applies.'"[72] The damages affirmed in *Jones* consisted of certain aspects of the structure and equipment; lost profits; and, since attempting to repair footings and foundations could have "disasterous results,"[73] any diminished market value as a result of faulty construction of the footings and foundations.

---

[68] *Id.* at 328, 322 N.W.2d at 656.

[69] See *"L" Investments, Ltd. v. Lynch, supra* note 64.

[70] See *id.*

[71] *Jones v. Elliott*, 172 Neb. 96, 108 N.W.2d 742 (1961).

[72] *Id.* at 107, 108 N.W.2d at 748.

[73] *Id.* at 108, 108 N.W.2d at 749.

We agree with the de Vrieses that in the context of real property there may be circumstances where, because all physical defects cannot be fully repaired or replaced, the total award of damages will consist of both repair costs and diminution in value—as long as the total sum does not exceed the value of the real estate before the injury. But at issue here is the exclusion of expert testimony of diminished market value under the hypothetical that the repairs for which the de Vrieses sought compensation would fully repair all physical defects to the house. The offer of proof as to the expert witness' testimony did not specify that there was any remaining physical defect upon which the diminishment of value was based, and the court, in making its ruling, understood the question of stigma damages to be premised on reputation despite the absence of any lingering physical defect. The de Vrieses did not contest that was the issue presented and decided in the motion in limine.

The idea of stigma damages refers to a reduction in market value caused by a public's fear and is traditionally described as the diminishment in market value based on public perception or reputation in the absence of any permanent physical harm.[74] Stigma damages have been criticized for their dependence upon inaccurate or unreasonable perceptions that can change at any time.[75] Many courts have thus adopted a rule that only allows recovery for the public's perception of the risk associated with the real property when the repairs or remediation fail to fully eliminate the physical defects and some ongoing

---

[74] See, *Muncie v. Wiesemann*, 548 S.W.3d 877 (Ky. 2018); *Houston Unlimited v. Mel Acres Ranch*, 443 S.W.3d 820 (Tex. 2014); *Pflanz v. Foster*, 888 N.E.2d 756 (Ind. 2008); *Walker Drug Co., Inc. v. La Sal Oil Co.*, 972 P.2d 1238 (Utah 1998).

[75] See Jennifer L. Young, *Stigma Damages: Defining the Appropriate Balance Between Full Compensation and Reasonable Certainty*, 52 S.C. L. Rev. 409 (2001).

risk actually continues to exist.[76] They do not allow damages based on "pure . . . stigma."[77] Indeed, in circumstances where there is a residual physical defect, the resultant diminishment in market value arguably would not be accurately described as due to stigma at all.

[40] We agree that public perceptions of a defect when the evidence demonstrates there is none is an improper basis for recovery. In such scenarios, the longer the property demonstrates no lingering effects from the defects remedied, the more public perception will improve. The diminishment in value due to the stigma is thus ever changing. Damages related to such changing perceptions is inherently speculative and without reasonable certainty.

Based on the proffered expert testimony, the district court did not err in granting L&L's motion in limine excluding the presentation of evidence of stigma damages to the jury.

## VI. CONCLUSION

The district court did not err in refusing to determine the statute of limitations as a matter of law, in giving its instructions on the statute of limitations, or in failing to order remittitur or setoff of the damages award. The district court also did not err in excluding evidence of stigma damages. We affirm the judgment.

Affirmed.

Miller-Lerman, J., not participating.

---

[76] See, e.g., *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717 (3d Cir. 1994); *Berry v. Armstrong Rubber Co.*, 989 F.2d 822 (5th Cir. 1993); *Rudd v. Electrolux Corp.*, 982 F. Supp. 355 (M.D.N.C. 1997); *Ramirez v. Akzo Nobel Coatings, Inc.*, 153 Ohio App. 3d 115, 791 N.E.2d 1031 (2003); *Santa Fe Partnership v. ARCO Products Co.*, 46 Cal. App. 4th 967, 54 Cal. Rptr. 2d 214 (1996); *Adkins v. Thomas Solvent Co.*, 440 Mich. 293, 487 N.W.2d 715 (1992).

[77] See *Ramirez v. Akzo Nobel Coatings, Inc., supra* note 76, 153 Ohio App. 3d at 119, 791 N.E.2d at 1034.